**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

Tucson Plastic Surgery, LLC,

                          Plaintiff,

v.

MultiPlan, Inc., Aetna, Inc., The Cigna Group, UnitedHealth Group Incorporated and Elevance Health, Inc.,

                          Defendants.

---

Civil Action No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

**Table of Contents**

I.      Introduction ........................................................................................................ 4

II.     Parties .............................................................................................................. 13

III.    Co-Conspirators .............................................................................................. 17

IV.     Jurisdiction and Venue .................................................................................... 20

V.      Factual Allegations ......................................................................................... 21

        A.      The Out-of-Network Healthcare Services Industry is dominated by third-party payers and their provider networks. ........................................................ 21

                1.      Many providers operate outside of provider networks, offering out-of-network care, because of inadequate network rates. ................................ 24

                2.      Unlike HMOs, PPOs offer out-of-network coverage. ............................ 25

                3.      Competition among PPOs for out-of-network providers is a crucial element in a functioning market. ........................................................ 27

        B.      Historically, insurers have used a variety of methods to price out-of-network provider services. ...................................................................... 28

                1.      The "usual, customary, and reasonable" method has traditionally been used to calculate out-of-network payment. .......................................... 28

                2.      Prior industry collusion in the form of the Ingenix Cartel (1997–2009) demonstrates the industry's susceptibility to price-fixing schemes. ......... 32

                3.      FAIR Health, Inc. was created in 2009 to replace the Ingenix database and provide a more independent source for UCR calculations. .................... 34

        C.      Insurers abandoned UCR-based claims pricing in favor of a new scheme orchestrated by MultiPlan. .................................................................... 36

        D.      MultiPlan's business evolved from a traditional PPO network to a dominant force in claims repricing. .................................................................................... 38

                1.      MultiPlan 1.0 represented the company's initial focus on building and managing a nationwide Preferred Provider Organization (PPO) network. 38

                2.      MultiPlan 2.0 marked a shift towards claims repricing and the formation of the MultiPlan Cartel. .................................................................. 41

        E.      MultiPlan's claims pricing services are designed to fix prices and control payment rates. ...................................................................................... 43

                1.      The Data iSight methodology relies on a proprietary algorithm, but it is manipulated to generate artificially low payment rates. .......................... 43

                2.      MultiPlan's negotiation services are designed to pressure providers into accepting low payment offers, eliminating the possibility of meaningful negotiation. ................................................................................... 50

                3.      MultiPlan's contingent fee structure means they profit directly from lower payment rates paid to providers. .......................................................... 53

VI.     Defendants' Anticompetitive Scheme ............................................................. 54

        A.      MultiPlan invites insurers to participate in a collective action to suppress payment rates as part of a horizontal price-fixing conspiracy. ......................... 54

B.      Insurers have accepted MultiPlan's invitation to collude, demonstrating their commitment to the scheme in several ways.................................................... 59

    1.      Insurers delegate their pricing decisions to MultiPlan through contractual agreements, relinquishing control over key business decisions................ 59

    2.      Insurers share sensitive data with MultiPlan, granting it access to proprietary information that would not be shared in a competitive market. ...................................................................................................... 60

    3.      Insurers adhere to MultiPlan's pricing determinations, effectively accepting its pricing as the final word for out-of-network claims. ........... 62

C.      The MultiPlan Cartel operates as a "hub-and-spoke" conspiracy, with MultiPlan coordinating an agreement between insurers to fix prices for out-of-network services................................................................................................... 63

D.      There direct evidence of the MultiPlan Cartel's existence. ............................... 66

    1.      Contracts between MultiPlan and the Insurers evidence the MultiPlan Cartel conspiracy. ...................................................................... 66

    2.      Public statements and communications from MultiPlan and the Insurers acknowledge the existence of these agreements and the overall schemes.69

    3.      Internal communications between MultiPlan and Insurer Defendants expose the inner workings of the cartel, revealing how they coordinate pricing and share information. .................................................... 71

    4.      A U.S. Patent filed by a MultiPlan subsidiary explicitly details how the company and its insurer clients agree on a methodology to suppress out-of-network payments. ............................................................. 80

    5.      Government investigations and enforcement actions have also uncovered evidence of MultiPlan's agreements to suppress out-of-network payments to providers. ........................................................................ 80

E.      There indirect evidence of the MultiPlan Cartel's existence. ............................... 81

    1.      Insurers engage in actions which, absent concerted action, would be against their individual economic self-interest. ...................................... 81

    2.      The market for out-of-network providers is susceptible to the formation, maintenance, and efficacy of a cartel......................................... 87

VII.    Relevant Market and Monopsony Power....................................................... 104

A.      The relevant market is the U.S. commercial reimbursement market................ 104

B.      The MultiPlan Cartel has market power in the relevant market. ....................... 108

C.      The MultiPlan Cartel harms competition throughout the relevant market and has no procompetitive effects.................................................................... 111

VIII.   Fraudulent Concealment, Continuing Violation, And Tolling The Statute Of Limitations ........................................................................................................ 118

IX.     Anticompetitive Effects And Impact On Interstate Commerce ...................... 121

I.      Causes of Action ......................................................................................... 124

II.     Petition for Relief......................................................................................... 127

III.    Demand for Jury Trial................................................................................... 127

1.    Plaintiff,  Tucson Plastic Surgery, LLC, a plastic and reconstructive surgery practice, brings this action against MultiPlan, Inc. ("MultiPlan") as well as four insurers—Aetna, Inc. ("Aetna"), The Cigna Group ("Cigna"), UnitedHealth Group Incorporated ("United") and Elevance Health, Inc. ("Elevance") (together, "Insurer Defendants")—for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, for participating in a conspiracy to artificially suppress payments made to healthcare providers like Plaintiff for out-of-network treatment services.

## I.    **Introduction**

2.    This action seeks to hold MultiPlan accountable for its role in a far-reaching and unlawful cartel ("MultiPlan Cartel") involving the nation's largest health insurers. This conspiracy—a horizontal, multilateral price-fixing scheme orchestrated by MultiPlan—depresses payments for out-of-network care. Through a concerted agreement, the MultiPlan Cartel has effectively eliminated competition in the market for out-of-network treatment services, harming both providers and patients.

3.    The conspiracy among MultiPlan Cartel members constitutes a naked, horizontal price-fixing conspiracy constituting a per se violation of Section 1 of the Sherman Act. First, the MultiPlan Cartel's horizontal restraint of trade is a conspiracy among competitors—MultiPlan participates in the same market as the insurer members of the MultiPlan Cartel and operates as their agent in orchestrating the conspiracy. Second, the MultiPlan Cartel's conspiracy is a "hub-and-spoke" conspiracy, with MultiPlan acting as the central hub and the various insurer Co-Conspirators serving as the spokes. The MultiPlan Cartel's actions, both collectively and through individual agreements between MultiPlan and the Insurers, have effectively stifled competition in the market for out-of-network treatment services, causing substantial anticompetitive harm to the market and to Plaintiff.

4.     The difference between "out-of-network" and "in-network" claims (and the rates at which they are reimbursed by insurers) stems from providers' contractual agreements with insurance companies. In-network providers have agreed to accept pre-negotiated, heavily discounted contract rates for their services, which are set by the insurers, in exchange for access to their plan members (often called "patient steerage"). Conversely, out-of-network providers have declined to enter into these agreements (often because the in-network rates offered are unreasonably low) and are free to set prices based on what the market can bear.

5.     Patients often prefer (and in some cases require) treatment from out-of-network providers, including in cases of emergency, where an established patient-provider relationship exists, where in-network options are lacking, or where highly specialized care is needed.

6.     In the context of plastic and reconstructive surgery, access to out-of-network treatment is essential for patients. Many individuals seeking plastic or reconstructive surgery seek out practitioners with unique expertise, such as those with specialized training in breast reconstruction. These specialized providers often do not participate in certain insurance networks, making out-of-network care the only option for patients seeking their services.

7.     Given the persistent consumer demand for out-of-network care options, many insurance plans offer out-of-network coverage to plan members (or "subscribers"). In fact, out-of-network benefits are the defining feature of the nation's most popular insurance plan type: the preferred provider organization ("PPO"). PPO plans offer a network of healthcare providers while also providing for the flexibility to seek out-of-network care.

8.     Relative to other plan types, like health management organizations ("HMOs"), PPOs command higher premiums in part because they afford their subscribers the freedom to see any provider of their choosing (assuming they are willing to incur increased out-of-pocket costs

for out-of-network care). HMOs, in contrast, typically cover services performed only by "in-network" providers.

9.    Under normal market conditions, insurers are incentivized to ensure that PPO subscribers (who are paying a premium relative to HMO subscribers to obtain out-of-network benefits) have access to quality out-of-network care options, including by paying providers competitive reimbursement rates. Insurers understand that paying below-market reimbursement rates might result in providers either: (a) refusing to treat their subscribers on an out-of-network basis, or (b) billing those subscribers for the portions of their claims not covered by insurance (a process known as "balance billing"). When this occurs, subscribers are functionally denied the full value of the out-of-network coverage they have paid for and may look to change plans. To avoid losing these subscribers, insurers have a strong unilateral economic interest in paying competitive out-of-network reimbursement rates, and in competing on that basis to satisfy both subscribers and providers.

10.    However, insurers' independent, short-term economic self-interest in competing for out-of-network providers (to avoid subscriber loss) conflicts with their collective, long-term interest in reducing overall out-of-network costs. This presents a collective action problem: To achieve the collective goal of reducing industry-wide out-of-network costs, insurers must work together to set rates. But such coordination is both: (a) logistically complex (given the number of claims, services, and insurers involved), and (b) difficult to enforce (given each insurer's individual incentive to undercut the competition by offering better out-of-network coverage through the provision of fair, competitive reimbursement rates to providers).

11.    The MultiPlan Cartel allows insurers to overcome this collective action problem—but in blatant violation of the antitrust laws. Instead of setting their out-of-network reimbursement

rates independently, most of the nation's insurers—roughly 700 out of 1,100 total (including all 15 of the largest insurers)—now outsource this rate-setting function to a common entity, MultiPlan. By acting collectively through MultiPlan, insurers (including the Insurer Defendants) effectively eliminate competition between themselves for out-of-network provider services. This constitutes naked price-fixing, a per se violation of the Sherman Act, that directly harms providers and patients alike.

12.    Plaintiff is a plastic and reconstructive surgery practice that renders high quality surgical services to individuals. Plaintiff is committed to delivering high-quality, individualized care and often treats patients on an out-of-network basis, recognizing that not all patients have access to in-network plastic and reconstructive surgical services. The MultiPlan Cartel's suppression of out-of-network reimbursement rates directly impacts Plaintiff's ability to continue offering these critical services in its community.

13.    As part of the MultiPlan Cartel's scheme, insurers are required and agree to provide MultiPlan with proprietary, competitively sensitive information (including claims pricing data and reimbursement strategies). This data enables MultiPlan to coordinate and suppress industry-wide reimbursement rates. As MultiPlan boasts, in order to set rates for the industry, it "leverages reimbursement data from millions of claims" to help insurers reprice out-of-network claims by "remov[ing] the guesswork." This is code for unlawful coordination on prices through the collection of each insurer's otherwise private and competitively sensitive reimbursement data.

14.    MultiPlan purports to determine out-of-network reimbursement rates "algorithmically" through propriety programs called "Data iSight" or "Viant." But these programs are little more than a technological smokescreen for traditional price-fixing. As MultiPlan admits, its programs merely calculate "median reimbursement levels." That is, MultiPlan's pricing

programs apply basic math functions to its datasets. However, MultiPlan ensures that its calculations are artificially low by relying on junk data, including data reflecting what insurers pay providers on an in-network basis. As noted above, in-network rates reflect the steep discounts that some providers agree to offer insurers in exchange for the benefits of network participation (most notably, increased patient volume). They do not represent reasonable rates of reimbursement for out-of-network providers, who have entered into no such agreements with insurers and thus do not stand to gain the benefits of network participation.

15.    To further suppress and coordinate out-of-network reimbursement levels, MultiPlan instructs many insurers, including the Insurer Defendants, to enter specific algorithmic "overrides" such as "Don't pay more than X% of the Medicare rate." The imposition of such rate caps by even a few of the largest insurers (which, given their market share, are responsible for a huge proportion of all out-of-network claims) results in rapid downward shifts in industry-wide reimbursement levels. Reimbursements paid to providers based on these artificial caps become the very data points MultiPlan then feeds its algorithm to calculate median reimbursement levels in the future. This creates a feedback loop, whereby the cartel increasingly benefits from its anticompetitive conduct over time. Once the market resets based upon these new, suppressed levels of reimbursement, MultiPlan can instruct insurers to enter even lower rate caps—all while assuring them that they will remain (in the words of one MultiPlan executive) in the "middle of the pack" as compared to competitors, thus avoiding competitive harms.

16.    MultiPlan does not stop there. To ensure its fixed reimbursement rates hold, MultiPlan negotiates with providers on behalf of its insurer clients, who agree to honor MultiPlan's negotiated rates. In over 95% of cases, providers—having no other choice—"accept" the initial offer made by MultiPlan, and agree as a condition of payment not to balance bill patients for the

unpaid portions of claims. As a result, in virtually all cases, the MultiPlan rate determination is the final rate of payment, not a mere "recommendation" to the insurer.

17.     MultiPlan points to high provider acceptance rates as proof that its payments are reasonable. But what they actually signal is the existence of a cartel (and that cartel's collective market power). Providers are forced to accept unprecedentedly low payment rates (and to relinquish their right to balance bill) because virtually all patients are now covered by insurers who coordinate their behavior through MultiPlan. The leverage that out-of-network providers once had—which was premised on the ability to discipline individual insurers through balance billing and service refusal—is gone. That providers have no alternatives confirms that the MultiPlan Cartel has significant market power. The threat of competition is virtually non-existent and thus incapable of disciplining the behavior of cartel members.

18.     The MultiPlan Cartel has resulted in the dramatic suppression of out-of-network payment rates. The traditional method of calculating out-of-network payment rates is based on "usual, customary, and reasonable" provider charges, or "UCR." Under this method, the UCR payment for a particular service is determined by surveying the amounts providers in a particular geographic market charge for the same or similar medical services and then selecting an allowable charge amount within that distribution of values. Typically, insurers set the UCR payment amount at around the 80th percentile of what providers in the same market charge for a particular service. (That is, the UCR amount would represent a point in the distribution where approximately 80% of all charges would be below the UCR amount and 20% above.) Today, UCR amounts are calculated from objective data compiled by the independent non-profit organization, Fair Health, Inc. ("FAIR"). Unlike MultiPlan, FAIR charges a flat annual fee to insurers and is not compensated based on how low it calculates UCR amounts to be.

19.     MultiPlan, however, has changed the rules of the game by replacing the UCR method with its own price-coordination scheme. That strategy has paid off for the MultiPlan Cartel. According to an April 2020 study published by the Office of the New York State Comptroller, depending on the service provided, payments based on MultiPlan's repricing methodology were 1.5 to 49 times lower than payments for the same services based on the traditional method of calculating rates (i.e., UCR).[1] And whereas prior to 2016, payment rates typically rose over time, since 2016, they have fallen each year because of MultiPlan's price-coordination scheme. Rather than inure to the benefit of customers and insureds, these "savings" benefit insurance company executives and stockholders.

20.     In the context of payments made for reconstructive and plastic surgery claims are often less than 10–20% of the payment that would be expected for the same services based on the traditional method of calculating rates (i.e., UCR). This massive underpayment of these surgical services pressures existing providers to close or reduce services and causes patients to lose treatment access.

21.     Providers are forced to accept these increasingly low payment amounts for out-of-network services, which often do not even cover their operating costs.

22.     Low out-of-network payment rates can also indirectly suppress in-network rates, as providers' ability to profitably treat patients on an out-of-network basis is crucial for negotiating better in-network rates. By undermining the economic viability of billing on an out-of-network basis, insurers strip providers of this leverage, further entrenching lower in-network payment rates. These dynamics have forced many practices, particularly smaller ones, to shut their doors, to cease

---

[1] Office of the N.Y. State Comptroller, An Analysis of Reasonable and Customary Out-of-Network Reimbursement Rates for Medical/Surgical Services in the New York State Health Insurance Program, Report No. 2018-D-2, April 2020, https://perma.cc/T9E3-8LG9.

offering certain services, or to join massive hospital conglomerates, leaving patients with fewer and fewer healthcare options.

23.    MultiPlan knows it can get away with acting, in the words of an analyst, "like a mafia enforcer for insurers," because virtually every commercial healthcare payor has agreed to use its repricing methodology, leaving healthcare providers with no practical option but to accept the "repriced" payment amount that MultiPlan imposes. Indeed, MultiPlan has estimated that healthcare providers accept the payment amounts MultiPlan imposes for out-of-network services between 94.5% and 99.4% of the time.

24.    Even in the cases where MultiPlan offers to "negotiate," that negotiation is one-sided. MultiPlan knows that, by bombarding healthcare providers with a constant stream of "repriced" payment demands, it is practically impossible for healthcare providers to meaningfully negotiate or pursue dispute resolution with respect to individual claims. Accordingly, any "negotiation" with MultiPlan starts from the position of MultiPlan's collusive offer to radically underpay healthcare providers for their services, and invariably ends with MultiPlan forcing the healthcare provider to capitulate to an extreme underpayment.

25.    MultiPlan has a direct economic stake in this race to the bottom. For each claim it reprices, MultiPlan receives a fee from the insurer based on a percentage of the difference between the initial claim amount and what the insurer pays.[2] In other words, MultiPlan gets paid more as providers get paid less. The revenues generated by MultiPlan from its repricing services have gone from $23 million in 2012, to $564 million in 2020 and $709 million in 2021. Insurers choose to pay MultiPlan's high fees to facilitate their rate-fixing scheme.

---

[2] In addition, as explained below, Defendant Insurers and other members of the MultiPlan Cartel also collect similarly-calculated contingency fees when those insurers act as administrators to self-funded employer plans.

26.     The MultiPlan Cartel dates to roughly 2015, but it is not the first scheme by insurers to suppress out-of-network payment rates. From the late 1990s to roughly 2009, insurers fixed these rates through a Unitedcare subsidiary, Ingenix, Inc. ("Ingenix"), which functionally calculated UCR amounts for the industry. But as a New York Attorney General ("NYAG") investigation revealed, Ingenix was systematically understating UCR, including by polluting its claims database with discounted in-network payments, as MultiPlan does today.[3] The Ingenix scheme artificially suppressed out-of-network payment rates by 10–28%, leading to massive liability. In 2009, twelve insurers (including the "big four"—Blue Cross/Blue Shield, United, Cigna, and Aetna) settled with NYAG. They agreed to invest hundreds of millions of dollars in the creation of a new, independent UCR database to replace Ingenix—which would become FAIR—and refrain from developing or using any alternative to FAIR for at least five years. The five-year terms of those settlements ended in 2015 and 2016. When those bans lapsed, insurers shifted away from FAIR and began to fix rates again via MultiPlan.

27.     The actions of the MultiPlan Cartel and its price-fixing scheme have recently been the subject of an exhaustive investigation by the New York Times that included interviewing 100 witnesses and evaluating tens of thousands of pages of confidential internal records.[4] That investigation concluded that MultiPlan runs a "lucrative, little-known alliance" of healthcare payors that underpays healthcare providers and undermines the value of commercial insurance.

28.     The New York Times investigation has prompted new scrutiny of MultiPlan and

---

[3] *See* N.Y. State Office of the Att'y Gen., Health Care Report: The Consumer Reimbursement System is Code Blue (Jan. 13, 2009), https://perma.cc/NU82-3TQH.

[4] *See* Chris Hamby, Insurance Companies Reap Hidden Fees as Patients Get Unexpected Bills, N.Y. Times (Apr. 7, 2024, updated Apr. 9, 2024) ("NYT Report"), https://tinyurl.com/386dhe75; Health Insurers' Lucrative Alliance That Drives Up Patient Bills: 5 Takeaways, N.Y. Times (Apr. 7, 2024), https://tinyurl.com/4f4ttb5f; In Battle Over Health Care Costs, Private Equity Plays Both Sides, N.Y. Times (Apr. 7, 2024), https://tinyurl.com/7hwmjavw.

its practices. For example, on April 9, 2024, the American Hospital Association called for a federal government investigation into MultiPlan's conduct. In addition, on April 29, 2024, United States Senator Amy Klobuchar sent a letter to Assistant Attorney General Jonathan Kanter and Federal Trade Commission ("FTC") Chair Lina Khan asking them to investigate whether MultiPlan facilitates collusion between commercial health insurance payors. She expressed concern that MultiPlan's "algorithmic tools are processing data gathered across numerous competitors to subvert competition among insurance companies."

29.     On May 1, 2024, The New York Times reprised its reporting, publishing an article specifically focused on MultiPlan's price-fixing. Entitled "Collusion in Health Care Pricing? Regulators Are Asked to Investigate," the article noted: "[MultiPlan] has helped big health insurers cut payments to doctors, raising concerns about possible price fixing."[5] The article describes current price-fixing litigation against MultiPlan and quotes Barak Orbach, a law professor at the University of Arizona, as saying: "This should trigger an investigation by the agencies. There seems to be a really strong case."

30.     Plaintiff brings this action to recover damages for injuries suffered as a result of the MultiPlan Cartel's unlawful price-fixing scheme, as well as to seek injunctive and other appropriate relief.

## II.    <u>Parties</u>

31.     Plaintiff, Tucson Plastic Surgery, LLC, is a limited liability company organized under the laws of Arizona. Its principal place of business is in Tucson, Arizona. Its surgical practice is located in Arizona, and its corporate office is located in Arizona.

32.     Plaintiff renders high quality treatment to its patients that allows patients to achieve

---

[5] Chris Hamby, N.Y. Times (May 1, 2024), https://tinyurl.com/447wbbpf.

a higher quality of life. Plaintiff provides high quality plastic and reconstructive surgery, including breast reconstruction, while also offering other cosmetic procedures.

33.    While Plaintiff participates in several insurance networks, it often treats patients on an out-of-network basis. For these patients, Plaintiff submits out-of-network claims for payment, including to insurers who use MultiPlan's out-of-network claims repricing services and are members of the MultiPlan Cartel. Plaintiff has received unreasonably low rates of payment on those claims as a result of the unlawful price-fixing conspiracy alleged herein.

34.    Defendant MultiPlan, Inc. ("MultiPlan") is a New York corporation. Its principal place of business is located at 115 Fifth Avenue, 7th Floor, New York, New York. MultiPlan is wholly owned by MultiPlan Holding Corporation. The ultimate parent company of MultiPlan Holding Corporation is MultiPlan Corporation. MultiPlan Corporation is a publicly traded entity. MultiPlan, which purports to be a third-party out-of-network claims repricing service, serves as the conduit by which cartel members share, inter alia, detailed, competitively sensitive, non-public information.

35.    MultiPlan has a number of subsidiaries, including Viant, Inc. ("Viant"), a healthcare cost management company incorporated in Nevada and headquartered in Illinois, which MultiPlan acquired in 2010; and healthcare cost management companies National Care Network, LP, incorporated and headquartered in Texas, and its affiliate National Care Network, LLC, incorporated in Delaware and headquartered in Texas, which MultiPlan acquired in 2011.

36.    Until October 2020, MultiPlan was a privately held corporation. In October 2020, Churchill Capital Corp. III and its related entities acquired MultiPlan, Inc. and its related entities. Churchill Capital Corp. III is a special-purpose acquisition company created to raise funds to take a private company public. It is incorporated in Delaware and headquartered in New York. After

14

completing the acquisition of MultiPlan, Inc. and its related companies, Churchill Capital Corp. III changed its name to MultiPlan Corporation.

37.    In addition to its repricing services, MultiPlan operates multiple nationwide PPO networks. It recruits healthcare providers, negotiates payment rates with them, and sets certain quality and credentialing expectations for the healthcare providers in its network. Then, MultiPlan sells access to its PPO networks as part of a healthcare insurance plan.

38.    Defendant Aetna, Inc. ("Aetna"), a subsidiary of CVS Health Corporation, is one of the largest commercial health insurance payers in the United States. It has a commercial insurance network that pays in-network and out-of-network claims from healthcare providers in all 50 states and the District of Columbia. It is a Delaware corporation headquartered in Hartford, Connecticut. Aetna is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. Aetna is a member of the MultiPlan Cartel and began using MultiPlan's out-of-network claims repricing services in May 2015.

39.    Defendant The Cigna Group ("Cigna") is one of the largest health insurance companies in the United States. It is a corporation organized under the laws of the State of Delaware, with its principal place of business in Broomfield, Connecticut. Cigna is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured

commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. Cigna is a member of the MultiPlan Cartel and began using MultiPlan's out-of-network claims repricing services in 2015.

40.     Defendant UnitedHealth Group Incorporated ("United") is one of the largest health insurance companies in the United States. It is a Delaware corporation with a principal place of business in Minnetonka, Minnesota. United has two divisions: (1) UnitedHealthcare, which provides health benefits plans, and (2) Optum, which provides health services, including pharmacy benefit manager services. United is a vertically integrated healthcare enterprise with a portfolio of wholly owned subsidiaries comprising a massive healthcare ecosystem. These subsidiaries include the largest commercial health insurance company in the United States. United has a commercial insurance network that pays in-network and out-of-network claims from healthcare providers in all 50 states and the District of Columbia. United's insurance plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service-only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. United is a member of the MultiPlan Cartel and began using MultiPlan's out-of-network claims repricing services in 2016.

41.     Elevance Health, Inc. (formerly known as Anthem, Inc.) ("Elevance") is one of the largest health insurance companies in the United States. Elevance is a member of the Blue Cross and Blue Shield Association, a joint venture of insurance companies that work together to offer their members access to a nationwide network of healthcare providers. It is an Indiana corporation with a principal place of business in Indianapolis, Indiana. Elevance licenses certain trademarks and service marks from the Blue Cross and Blue Shield Association in 14 states: California,

Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, most of Missouri, Nevada, New Hampshire, parts of New York, Ohio, Virginia (except the Washington, D.C. suburbs), and Wisconsin. Elevance is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. On information and belief, Elevance is a member of the MultiPlan Cartel.

42.    Aetna, Cigna, United and Elevance are collectively referred to in this complaint as the "Insurer Defendants." They have each executed an out-of-network claims repricing services agreement with MultiPlan and have participated in the MultiPlan price-fixing Cartel. Each has performed acts and made statements in furtherance of the conspiracy. Accordingly, along with MultiPlan, the Insurer Defendants are jointly and severally liable for all the acts and omissions of their Co-Conspirators, whether named or not named in this complaint.

### III.    Co-Conspirators

43.    The named Defendants are not the only participants in the MultiPlan Cartel. MultiPlan sets out-of-network payment rates for nearly all major health insurers in the United States, and many of the smaller ones. It has bragged that it contracts with some 700 health insurance companies and payers—including the 15 largest health insurers in the United States— to provide out-of-network claims repricing services.

44.    The conspiracy alleged herein includes any person or entity that has entered into an out-of-network claims repricing services agreement with MultiPlan, used MultiPlan's out-of-network claims repricing tools to process claims for out-of-network healthcare services, or otherwise participated with the Defendants in the alleged anticompetitive conspiracy and

performed and made statements in furtherance of the conspiracy.

45.     Defendants are jointly and severally liable for the acts of these Co-Conspirators, whether or not they are named as defendants in this complaint, including but not limited to:

46.     Blue Shield of California Life & Health Insurance Company ("BSCA") is a health insurance company. It is a California corporation with a principal place of business in California. BSCA is a licensee of the Blue Cross and Blue Shield Association and is licensed to offer Blue Cross and Blue Shield-branded health insurance plans in California. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self- funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. BSCA is a member of the MultiPlan Cartel. On information and belief, BSCA began using MultiPlan's out-of-network claims repricing services around the same time as the other Insurer Defendants.

47.     Blue Cross and Blue Shield of Florida, Inc. ("BCBSFL") is a health insurance company. It is a Florida corporation with a principal place of business in Florida. BCBSFL is a licensee of the Blue Cross and Blue Shield Association and is license to offer Blue Cross and Blue Shield-branded health insurance plans in Florida. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. On information and belief, BCBSFL is a member of the MultiPlan Cartel.

48.     Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBSMI") is a Michigan mutual insurance company. Its principal place of business is in Michigan. BCBSMI is a licensee of the Blue Cross and Blue Shield Association and is license to offer Blue Cross and Blue

Shield-branded health insurance plans in Michigan. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. On information and belief, BCBSMI is a member of the MultiPlan Cartel.

49.    Health Care Service Corporation, a Mutual Legal Reserve Company ("HCSC") is one of the largest health insurance companies in the United States. It is organized as a mutual reserve company under the laws of the state of Illinois with a principal place of business in Chicago, Illinois. HCSC licenses certain trademarks and service marks of the Blue Cross and Blue Shield Association and does business in Illinois as Blue Cross and Blue Shield of Illinois. HCSC is the parent company, or is otherwise affiliated or related, to various commercial health insurance plans and prescription drug plans that operate in the United States, including in Illinois, Montana, New Mexico, Oklahoma, and Texas. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. On information and belief, HCSC is a member of the MultiPlan Cartel.

50.    Centene Corporation ("Centene") is one of the largest health insurance companies in the United States. It is a Delaware corporation with its principal place of business in St. Louis, Missouri. Centene is the parent company, or is otherwise affiliated or related, to various commercial health insurance plans and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service

only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. On information and belief, Centene is a member of the MultiPlan Cartel.

51.     Humana Inc. ("Humana") is one of the largest health insurance companies in the United States. It is a Delaware corporation with its principal place of business in Louisville, Kentucky. Humana is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans and prescription drug plans that operate in the United States. The plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service-only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. On information and belief, Humana is a member of the MultiPlan Cartel.

## IV.    <u>Jurisdiction and Venue</u>

52.     This case arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 & 26). Plaintiff seeks treble damages for their injuries resulting from Defendants' anticompetitive conduct, to enjoin Defendants' anticompetitive conduct, and for such other relief as is afforded under the laws of the United States.

53.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and § 1337(a) (antitrust), and 15 U.S.C. § 15 (antitrust). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as this is a civil action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

54.     This Court has personal jurisdiction over MultiPlan because it is domiciled and has its principal place of business in New York. MultiPlan also transacts business throughout the United States, including in this district (including repricing claims for out-of-network healthcare services performed in this district). MultiPlan is also engaging in the alleged antitrust conspiracy,

which has a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.

55.    This Court has personal jurisdiction over the Insurer Defendants because each of them transacts business throughout the United States, including in this district (including providing payments for out-of-network claims for healthcare services performed in this district), and engages in the alleged antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.

56.    Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391, because certain unlawful acts by the Defendants were performed in this district, and those and other unlawful acts caused harm to interstate commerce in this district. No other forum would be more convenient for the parties or witnesses to litigate this case.

## V.    Factual Allegations

### A.    The Out-of-Network Healthcare Services Industry is dominated by third-party payers and their provider networks.

57.    Roughly 90 percent of U.S. healthcare expenses—including those related to out-of-network care—are paid for not by patients themselves, but by an assortment of public and private third-party payers ("TPPs"), often referred to as "insurers." Third-party payers include government-funded insurance programs (like Medicare and Medicaid), self-insured employers (whose plans are typically administered by commercial insurance companies), and commercial insurance companies themselves (such as United, Anthem, Aetna, Humana, Cigna, and the various Blue Cross/Blue Shield companies).

58.     Most healthcare providers depend upon payments from insurers to stay in business. Typically, providers collect only nominal amounts from patients at the point of service (usually in the form of "copays" or "co-insurance"). They then submit the bill (or "claim") for services rendered to the patient's insurer to obtain payment.

59.     All medical claims submitted to insurance use the same set of uniform billing codes. Procedure code sets like CPT ("Current Procedure Terminology") and ICD-10-PCS ("International Classification of Diseases, 10th Revision, Procedure Coding System") tell the payer *which* service the provider performed. Diagnosis codes sets like the ICD-10-CM ("International Classification of Diseases, 10th Revision, Clinical Modification") tell the payer *why* the patient received the service. Most claims contain numerous codes, reflecting each diagnosis and treatment administered during a medical visit. Typically, providers receive payment for each code billed (so long as it is covered by the patient's healthcare plan).

60.     Healthcare providers often employ administrative professionals called "billers" and "coders" to extract billing information from patients' medical charts, generate the claims that are submitted to insurance, and ensure that the proper payment amounts are received. Many providers also employ third-party clearinghouses to pre-screen claims, correct errors, and securely transmit them to insurers (and patients).

61.     Insurers seek to predict and, if possible, limit the prices they will pay for medical services. To that end, most insurers maintain "networks" of healthcare providers who have agreed to offer one or more insurers discounted rates for services in exchange for: (a) access to their subscribers (often called "patient steerage"), and (b) the avoidance of certain administrative burdens associated with negotiating the cost of services with insurers on an ad hoc basis.

62.     Network agreements between providers and insurers typically detail the kinds of

services to be covered by the insurer, the amount the provider will be reimbursed for each covered service, and the process by which claims for payment are adjudicated.

63.    Network agreements contain proprietary, competitively sensitive terms, including agreed-upon rates that result from closed-door negotiations between insurers and providers.[6] Insurers seek to protect the rates and other information in their network agreements from disclosure. They know that competing insurance companies may use the information to lure providers to their networks by offering superior terms (which in turn drives up in-network rates for the industry). They also know that healthcare providers may leverage the information to demand more favorable rates during future negotiations. Moreover, public disclosure of negotiated rates can lead to subscriber backlash if negotiated discounts do not result in lower plan premiums. Given these sensitivities, the industry has taken the position that agreed-upon rates under in-network agreements are trade secrets.

64.    The in-network rates insurers offer providers—even for the same services—vary widely. Hospitals, with their extensive service offerings and substantial market presence, typically command higher payment rates from insurance companies, whereas independent practices, including most plastic and reconstructive surgery practices, due to their smaller size and limited bargaining power, typically secure far less favorable in-network rates.

65.    In many cases, the in-network rates offered fall below the operational costs incurred by providers. As one recent study by the American Medical Group Association reports, the median loss for medical groups was $249,000 per physician. A provider in this situation is then faced with

---

[6] Prior to 2022, in-network rates were virtually always treated confidential and proprietary. In 2022, federal legislation went into effect requiring insurers to disclose the terms of certain network agreements with hospital. Transparency in Coverage, 85 Fed. Reg. 72,158 (Nov. 12, 2020) (to be codified at 26 C.F.R pt. 54; 29 C.F.R. pt. 2590; 45 C.F.R. pt. 147; and 45 C.F.R. pt. 158).

a difficult decision: They can accept inadequate in-network rates, knowing that doing so may leave them in financial extremis. Or they can decline to join some or all insurance networks (knowing it will result in the loss of patient volume), which allows them to bill patients' insurance plans (assuming those plans have out-of-network benefits) at the prevailing market rate.

1.    ***Many providers operate outside of provider networks, offering out-of-network care, because of inadequate network rates.***

66.    Many providers refrain from participating in network arrangements for one, some, or all insurers. Some providers determine that the in-network rates offered by insurers are too low (which is often the case for independent practices), or that the network will not provide them with adequate patient volume to justify the requested discounts. Other providers refuse to join certain networks because of the administrative burden and expense associated with obtaining in-network payment.

67.    Claims submitted to an insurer for healthcare services covered by a network agreement are called "in-network" or "contracted" claims. Claims for services not covered by a network agreement are called "out-of-network," "non-contracted," or "retail" claims.

68.    The ability of providers to submit out-of-network claims in this way, obtain fair payments for them, and profitably practice medicine outside of insurance networks represents a powerful form of leverage on the side of providers in negotiating in-network rates. It functions, essentially, as a check on insurers' ability to drive in-network rates too low. However, as described herein, the MultiPlan Cartel drastically reduces providers' leverage in this regard by suppressing out-of-network payment rates far below competitive levels, such that the threat of any provider going out-of-network becomes increasingly hollow. This, in turn, indirectly suppresses in-network rates as well.

69.    The payment process for in-network claims is relatively straightforward. Once the

insurer receives a claim from an in-network provider, the claim enters the adjudication process, during which the claim will either be "accepted" (meaning paid), "denied" (not paid), or "rejected" (returned due to error). If some but not all of the services reflected in the bill are covered by the insurer's plan, the insurer may approve the covered costs while rejecting the non-covered costs.

70.      Following adjudication, the insurer submits a report to the provider detailing which codes it is willing reimburse and at what rate (according to parties' network agreement). The provider then checks the report for accuracy and may begin an appeals process (the procedure for which is governed by the network agreement) should a dispute arise.

71.      In contrast, when a provider is out-of-network, there is no contract between the insurer and the provider to govern the parties' obligations to one another, how claims are adjudicated, or the means for resolving any disputes over such claims. Nor is there an obligation on the part of the provider to render out-of-network services to an insurer's members, with certain limited exceptions (like emergency care). In the absence of such an agreement, the insurer and provider are left to negotiate what services will be paid for, and in what amount, on the free market.

### 2.      *Unlike HMOs, PPOs offer out-of-network coverage.*

72.      Not all insurance plans cover out-of-network services, and those that do are typically priced at a premium. The two most common forms of health insurance in the United States are HMOs and PPOs. Both employ provider networks to manage costs. However, HMOs require patients to obtain healthcare services only from providers that participate in the plan network, and who have agreed to offer steeply discounted prices to plan members.[7] PPOs, by contrast, give patients a choice: They can either obtain care from a cost-effective in-network

---

[7] An HMO plan may, at times, provide partial reimbursement for services performed by a healthcare provider not within network, but only in extraordinary circumstances. Such coverage typically requires prior authorization by the insurer, which will pre-negotiate the terms of reimbursement with the provider.

provider (and receive the maximum payment from the insurer under their plan) or they can get care from an out-of-network provider of their choosing (and receive a reduced though still significant payment amount).

73.    Under most PPO plans, insurers agree to pay a large, fixed percentage (typically 80–90%) of the expected charge of out-of-network care, which insurers typically refer to as the ''usual, customary, and reasonable'' (or "UCR") amount, less the patient's cost-share contribution. The UCR amount, as described further below, is supposed to be fair reflection of the market rate for a given service in a particular geographic area.

74.    Because the insurer does not have a contract with the out-of-network provider, the consumer is financially responsible for paying the balance of the bill (i.e., the portion of the bill the insurance company does not pay). And the provider may, as a matter of law (with some limited exceptions), pursue the remainder of its charge from the consumer, regardless of how little or how much the insurer reimburses the consumer.[8]

75.    The option to see out-of-network health insurance providers comes at a cost to subscribers. PPO premiums (and deductibles) are significantly higher on average than those for HMOs. For example, for a 30-year-old, the average PPO plan established under the Affordable Care Act costs about $800 more per year than the average HMO plan. Nevertheless, PPOs are the most common plan type in the United States, with nearly half of all insured U.S. employees covered by a PPO, reflecting payers' and patients' preference for increased provider choice.

76.    There are many reasons consumers may choose to pay higher premiums and

---

[8] Recent legislation has placed prohibitions on balance billing for emergency care and for certain out-of-network care performed at an in-network facility. *See* Requirements Related to Surprise Billing, 87 Fed. Reg. 52,618 (Aug. 26, 2022) (to be codified at 26 C.F.R pt. 54; 29 C.F.R. pt. 2590; and 45 C.F.R. pt. 149).

deductibles for the option of seeing out-of-network providers. After changing employers, a person may wish to continue working with certain providers, like a longstanding primary care physician, even if those providers no longer participate in the insured's new healthcare plan. Other patients know that they have a medical condition that requires specialized treatment that may be available only from out-of-network providers. Geography is also a factor, as convenient in-network options are often limited for those who travel frequently or who live in rural areas. And many consumers wish to protect themselves financially in the event of a new diagnosis or emergency, when obtaining in-network care may be impossible or inferior to other options.

77.     And insurers understand why out-of-network coverage appeals to U.S. consumers. That is why they market PPOs with labels like "freedom" and "choice." Yet, behind the scenes, they do everything possible to under-reimburse the out-of-network providers who make PPO plans desirable in the first place.

### 3. Competition among PPOs for out-of-network providers is a crucial element in a functioning market.

78.     In a competitive market, insurers that sell plans with out-of-network benefits are incentivized to ensure that plan subscribers can obtain services from out-of-network providers. To do so, insurers must, at a minimum, pay out-of-network providers competitive payment rates.

79.     Insurers know that a provider who receives below-market payment amounts for out-of-network care may, in response, refuse to serve their members in the future, or elect to balance bill those patients for the uncovered portions of their out-of-network claims. When this occurs, subscribers are harmed financially, and may decide that their plans' out-of-network benefits are overpriced (or even illusory). This may lead them to switch to a competing PPO. The industry often refers to this as member and provider "abrasion."

80.     Given the risk of such "abrasion," under normal market conditions (i.e., absent a

market restraint), it would be economically irrational for an individual insurer to lowball out-of-network providers with below-market payments. Insurers would instead compete against each other for out-of-network provider services to keep their current PPO subscribers happy (and obtain new ones), including by offering competitive payment rates on out-of-network claims.

81.     But as set forth in further detail below, such competition has been eliminated by the MultiPlan Cartel. Insurers now act collectively, though MultiPlan, to slash out-of-network payment rates. Absent an assurance that their competitors are doing the same thing, individual insurers would not lowball out-of-network providers in this way for fear of creating subscriber and provider abrasion. The MultiPlan Cartel provides them with that assurance.

**B.      Historically, insurers have used a variety of methods to price out-of-network provider services.**

*1.      The "usual, customary, and reasonable" method has traditionally been used to calculate out-of-network payment.*

82.     Historically, normal competitive pressures (along with inflation and other factors) tended to drive up the price of out-of-network care over time. But the insurance industry had a system in place to ensure that they would not be on the hook for excessive provider pricing: UCR.

83.     For decades, and until the late 1990s, health insurers based out-of-network payments on statistical benchmarks for medical costs based on prevailing market rates, i.e., the retail prices charged by doctors in particular geographic areas (UCR amounts).

84.     Historically, UCR rates were calculated using data from two databases: the Prevailing Healthcare Charges System ("PHCS") and Medical Data Resource ("MDR"). PHCS was created in 1973. Until the late 1990s, it was run by then the then-insurance industry trade organization, Health Insurance Association of America ("HIAA").[9] MDR was created in 1987;

---

[9] HIAA later merged with another industry trade association, the American Association of Health Plans ("AAHP") to form America's Health Insurance Plans ("AHIP"), of which the executives of

until the late 1990s, it was run by Medicode.

85.    Insurers and providers have always understood that the UCR amount refers to the "the prevailing rate doctors charge when they have not negotiated a lower rate with the insurer on an in-network basis."[10] That's because when a doctor (or other professional) provides services on an out-of-network basis, they do not receive the promise of increased patient volume and other benefits (like prompt and predictable payment) that come with contracting to participate in an insurer's network. In the absence of increased volume or other contractual inducements, providers would not offer discounts to payers, and payers would not expect to pay substantially less than the retail charge amount. Therefore, pre-negotiated, discounted, in-network rates do not and have never represented reasonable rates of payment for out-of-network claims, and have never been relevant to the proper calculation of UCR amounts.

86.    Accordingly, to properly calculate UCR amounts, insurers historically used aggregated, retail medical charge data (not payment data) for like healthcare services performed in the same geographic markets. The calculation of a UCR amount is simply a matter of math applied to appropriate charge data—it is the determination of a amount representing a percentile value within a distribution of charge data.[11]

87.    Insurers exercise discretion to determine what percentile amount they use as the applicable UCR amount for their plans. Insurers also decide whether and ot what extent its subscribers are responsible for the UCR amount (i.e., whether they are required to pay a

---

many of the Insurer Defendants and co-conspirators in this case are high-ranking board members.

[10] Deceptive Health Insurance Industry Practice: Are Consumers Getting What They Paid For? (Part I): S. Hr'g. 111-37 Before S. Comm. on Commerce, Science, & Transportation, 111th Cong. 5 (2009), https://perma.cc/6U25-FDJR.

[11] As an example, a "median" is simply a 50th percentile value.

coinsurance amount representing a portion of the UCR amount).

88.    Historically, many insurers employed the 80th percentile rule to calculate UCR amounts. This method is based on the distribution of charges for similar medical services within a specific geographic area; it pegs the UCR amount to the charge amount below which 80% of all submitted charges fall. For example, if, after analysis, the 80th percentile charge for a colonoscopy in a particular geographic area is identified as $1,200, this figure becomes the UCR amount for that service in that market. This approach aims to ensure that UCR amount reflect prevailing market rates (covering the majority of charges up to the 80th percentile), while eliminating higher outlier charges.

89.    Determining UCR amounts in this way does not mean that insurers pay providers the entire UCR amount. Instead, insurers would typically cap payment at 80–90% of the UCR amount and require that the subscriber to pay the remainder as co-insurance. For example, an insurer that promised plan members that it would reimburse out-of-network claims at 80% of the UCR amount would pay the lower of the actual billed charge or 80% of the UCR amount for similar procedures in the same geographic area; the patient would then contribute the remaining 20% of the UCR amount as co-insurance. The obligations of both insurers and patients were thus pegged to the UCR amount.

90.    A hypothetical example of how payment would be calculated under this method is as follows: A physician submits a $1,350 bill for a colonoscopy for a patient who has a PPO insurance plan with out-of-network benefits that: (1) follows the 80th percentile rule to set UCR amounts, and (2) pays only 80% of the UCR amount (with the other 20% paid as part of the subscriber's coinsurance). The insurer accesses data from a UCR database for other colonoscopies performed in the same geographic location. The data shows there were 10 other colonoscopies

performed in that region, which were billed at $500, $600, $700, $800, $900, $1,000, $1,100, $1,200, $1,300, and $1,400. These charges are then organized from lowest to highest to determine percentiles:

| Procedure | Percentile | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 20th | 30th | 40th | 50th | 60th | 70th | 80th | 90th |
| Colonoscopy | $600 | $700 | $800 | $900 | $1,000 | $1,110 | $1,200 | $1,300 |

91.     At the 50th percentile, half of the charges recorded in the database are lower, and half are higher. At the 70th percentile, 70% of recorded charges are lower, and 30% are higher. In this hypothetical, because the insurer uses the 80th percentile rule to calculate UCR amount, the UCR amount for colonoscopies in this geographical area is $1,200. As such, the plan would reduce the physician's billed charge from $1,350 to $1,200. Then, the insurer would pay 80% of that amount, or $960. The patient is then obligated to pay the remaining 20% of that $1,200 charge, or $240, as co-insurance.

92.     Once a healthcare provider receives notice from an insurer of the allowed amount of a claim, that provider has the option of seeking additional payment from the patient for the amount of the charged bill above the "allowed amount" (the amount representing the maximum payment a plan will pay for a covered service inclusive of coinsurance and deductibles). This is known as "balance billing." Using the above hypothetical again as an example, the doctor could bill the patient for the $150 difference between its charged claim ($1,350) and the allowed amount ($1,200).

93.     The UCR system represented a means of normalizing healthcare costs. As William Marino, former President and CEO of Horizon Blue Cross Blue Shield of New Jersey, explained to the U.S. Senate Committee on Commerce, Science and Technology in 2009, UCR was "designed to permit payment amounts that would be predictable, change with market-based

changes in prevailing payments, and keep insurance costs in check by eliminating excessive charges from the insurance pool."[12]

94.     In other words, UCR gave the insurance industry a means of combatting what some insurers claimed were excessive charges for medical care, while still adequately compensating providers. Despite having a means to control costs in a fair and reasonable way, insurers have, at various points, resorted to anticompetitive tactics to further reduce out-of-network costs.

2.     ***Prior industry collusion in the form of the Ingenix Cartel (1997–2009) demonstrates the industry's susceptibility to price-fixing schemes.***

95.     In many ways, the MultiPlan Cartel is the modern-day incarnation of a prior collusive effort by insurers to suppress out-of-network payment rates: the Ingenix Cartel.

96.     Between 1997 and 1998, a United subsidiary called Ingenix purchased the two then-existing claims databases used for the calculation of UCR: MDR and PHCS. It then consolidated those databases in 2001. With United's acquisition of all UCR claims databases, one of the largest insurance companies in the nation became functionally responsible for the way the entire industry would be setting UCR amounts (and, in turn, nationwide payment levels for out-of-network claims).

97.     Allowing an insurance company to control the nation's sole UCR database was a massive conflict of interest. Ingenix was incentivized to skew its aggregate claims data downwards in order to reduce apparent UCR amounts—and that is precisely what it did. Every dollar saved on out-of-network payments based on Ingenix's claims data represented increased profits for United, as well as for its rivals in the insurance industry.

98.     For more than a decade after United's acquisition of the nation's UCR data

---

[12] *See* Committee on Commerce, Science, and Transportation, Underpayments to Consumers by the Health Insurance Industry: Staff Report for Chairman Rockefeller, Office of Oversight and Investigations (June 24, 2009), https://perma.cc/TB63-SH6G.

infrastructure, the health insurance industry overwhelmingly used Ingenix data to set payment rates for out-of-network claims. But in the late 2000s, providers and consumers began to complain about uncharacteristically low out-of-network claims payment rates, which resulted in doctors balance billing patients for huge sums. These complaints spurred several investigations and lawsuits over Ingenix's practices, which eventually revealed that Ingenix was systematically manipulating its data with the purpose and effect of reducing apparent UCR amounts.

99.     Ingenix achieved this effect in several ways. First, Ingenix commingled charge data on claims submitted under network agreements (which reflected discounted in-network rates) with data reflecting out-of-network retail charges. As noted above, in-network rates do not represent reasonable rates of payment for out-of-network claims because when a provider performs services on an out-of-network basis, it does not receive any of the contractual benefits associated with network participation (i.e., increased patient volume). By improperly including heavily discounted in-network charges in its claims database, Ingenix systematically and artificially depressed the apparent prevailing market rates for services, and, in turn, the calculation of UCR amounts.

100.    Second, Ingenix removed higher-end claims from its databases using formulaic edits to identify and purge roughly 5% of all submitted charges without first investigating whether the charge information was incorrect. Insurance companies that contributed data to the Ingenix database did the same. For example, Aetna, which was Ingenix's single largest data contributor, "pre-scrubbed" its data before submitting it, eliminating the highest 20% of valid medical charges before sending claims data to Ingenix.

101.    Such data manipulation made the distribution of medical charges in Ingenix's UCR databases appear 10–28% lower than they really were. Any out-of-network claim payment calculations performed using Ingenix's data thus skewed 10–28% lower, resulting in

underpayments to health care providers and exposing patents to the risk of balance billing.

102.    Whenever an insurer or Ingenix received an inquiry from a doctor or patient regarding how UCR amounts were calculated, they responded, "it's proprietary." Meanwhile, Ingenix did not even attempt to maintain that its UCR data was accurate. As an Ingenix employee testified under oath:

> Ingenix has never tested its results to determine if its statistical
> conclusions bear any relationship to the actual high, low, median or
> 80th percentile . . . rates charged by health care providers in any
> given area.[13]

103.    As Ingenix and United would later be forced to admit, Ingenix's close ties with the industry—and its status as a United subsidiary—created "inherent" conflicts of interest.

104.    Several lawsuits were filed against insurers by physicians who were underpaid and by patients who were balance billed as a result of Ingenix's UCR database manipulation. In 2000, the American Medical Association ("AMA") and several state-specific medical associations filed a class action against United alleging that Ingenix improperly reduced out-of-network payments to healthcare providers in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the antitrust laws. The suit settled in 2009, with United agreeing to pay $350 million to class members.

> 3.    *FAIR Health, Inc. was created in 2009 to replace the Ingenix database and provide a more independent source for UCR calculations.*

105.    In February 2008, then-New York Attorney General Andrew Cuomo announced an investigation "into a scheme by health insurers to defraud consumers by manipulating reimbursement rates." Linda Lacewell, the assistant attorney general in charge of that investigation, described Ingenix as "essentially a closed-loop system of the health insurance

---

[13] *See*, supra, note 12.

industry collecting the information among itself, pooling the information together, all relying on the same information, a system that is impenetrable to the consumer." The investigation found, for example, that "[o]ne national insurer filled an entire page with a list of alternative ways in which it purported to calculate out-of-network rates, in language that can best be described as gobbledygook" when, in reality, it simply "pa[id] the same rates for in-network and out-of-network care."

106.    The NYAG investigation culminated in the demise of Ingenix. In January 2009, a settlement was announced between NYAG and United; as part of the deal, United agreed to shut down Ingenix and contribute $50 million to the formation of a new, independent non-profit organization, FAIR, to take ownership of the Ingenix UCR database. United further agreed to use FAIR for determining out-of-network payment rates for at least five years, and to refrain from using, owning, operating, or funding any other database for such purpose during that time.

107.    Similar settlements quickly followed for the other major insurers. Aetna agreed to pay $20 million for the creation of FAIR, to contribute untainted data to the new database, and to use FAIR for five years. Cigna and WellPoint, Inc. (later known as Anthem, and then Elevance) agreed to pay $10 million and to use FAIR for five years. Other smaller insurers reached settlement agreements that required them to contribute between $200,000 and $1.6 million and to use FAIR for five years.

108.    FAIR was incorporated in October 2009, and became available for use in mid-2010. Under the terms of its NYAG settlement, United was required to shut down the Ingenix database within 60 days of the date on which FAIR became available for use. Moreover, United and all other settling insurers were required to begin using FAIR within 60 days of the date on which it became operational, and to use it exclusively for the setting of out-of-network payment rates for a

period of at least five years. As FAIR became operational sometime in 2010, the obligation of the settling insurers (including the Insurer Defendants) to use FAIR expired sometime in 2015 or early 2016.

109.    Once United shut down Ingenix, all insurers that had previously used Ingenix (not just those that had settled with NYAG) had to switch to a different data source. Because United had purchased and consolidated the only two databases available a decade earlier (leaving no privately controlled alternatives in the marketplace), FAIR was the obvious and near-universal choice.

110.    FAIR began the gradual process of correcting the skewed UCR database it inherited from United. As FAIR collected more non-manipulated data from insurers (who were required by their settlement agreements to submit accurate, un-scrubbed charge data), the effects of the decades' long scheme to deflate payment rates began to subside. As a result, patients and physicians received more accurate and fair payments from insurers for the medical care they received or provided. But it did not last.

**C.    Insurers abandoned UCR-based claims pricing in favor of a new scheme orchestrated by MultiPlan.**

111.    Unsurprisingly, insurers were not happy with the free market dynamics of the UCR system, particularly when they could no longer manipulate UCR downward through Ingenix. Once the NYAG settlement agreements began to expire, insurers sought to eliminate UCR entirely, and to replace it with a different methodology that would systematically suppress out-of-network payment rates.

112.    Around this time, many insurance executives expressed a desire to use Medicare rates, which are incredibly low, as the new benchmark for setting out-of-network payment levels. However, these executives understood that absent collusion, using barebones Medicare rates as

the benchmark would lead to balance billing, create massive member and provider abrasion, and was therefore untenable. In other words, the major insurers would have to undertake such a shift together to ensure its success. MultiPlan would emerge on the scene at precisely this time to offer a vehicle for collusion.

113.    Indeed, the expiration of NYAG settlements opened the door for MultiPlan to become the new "independent" claims repricing service for the insurance industry. And almost immediately after insurers' obligations to use FAIR expired under their agreements with NYAG, the industry abandoned FAIR and instead began using MultiPlan's claims repricing services.

114.    A partial timeline of the 2015–2016 shift from FAIR to MultiPlan is below:

(a) Cigna began using FAIR in 2010. In 2015, it completed its five-year obligation to use FAIR. In 2015, it contracted with MultiPlan to use its claims repricing services.

(b) Aetna began using FAIR in 2010. In 2015, it completed its five-year obligation to use FAIR. On May 1, 2015, Aetna contracted with MultiPlan to use its claims repricing services.

(c) United shut down its Ingenix database and began using FAIR by 2011. In 2016, it completed its five-year obligation to use FAIR. And as United executives have testified, in 2016 United contracted with MultiPlan to use its claims repricing services for parts of its business, and further expanded such use in 2017.

(d) Other insurers also began using MultiPlan to reprice their out-of-network claims around the same time.

115.    The industry's adoption of MultiPlan's claims repricing methodology was rapid, coinciding with the end of the major insurers' five-year commitments to use FAIR. This represented a complex and historically unprecedented change in insurers' out-of-network claims pricing structure, which had, for decades, been based on appropriate UCR amounts for services. Such rapid and concerted industry-wide change in pricing practices was a telltale sign of collusion, and an understanding amongst major insurers that they all had to undertake the shift together to

ensure its success.

**D.    MultiPlan's business evolved from a traditional PPO network to a dominant force in claims repricing.**

      *1.    MultiPlan 1.0 represented the company's initial focus on building and managing a nationwide Preferred Provider Organization (PPO) network.*

116.    MultiPlan was not always in the claims repricing business. In fact, the company was founded in 1980 as a New York-based hospital network. Over time, MultiPlan expanded its provider and facility footprint. Today, it maintains a nationwide PPO network of over 1.3 million providers, which insurers can "rent" to decrease the number of claims that fall out-of-network. MultiPlan refers to its PPO network business as "MultiPlan 1.0."

117.    To build and maintain its massive PPO network, MultiPlan negotiates with providers and facilities across the country to "establish discounts" for payers "in exchange for patient steerage [to participating providers] and other provider-friendly terms and conditions."[14] MultiPlan then rents out its network to insurers, who, for a fee, get the benefit of the network discounts MultiPlan has negotiated. Insurers can use the MultiPlan PPO as either their primary provider network, or, in the case of larger insurers, to supplement or geographically extend their own preexisting networks. The terms of MultiPlan's rental arrangements with insurers are set forth in its standard "Network Rental Agreement."

118.    The value of MultiPlan's network—and amount of rent MultiPlan can extract from insurers—is directly tied to the number of providers MultiPlan can convince to participate. The more providers MultiPlan signs up around the country, the more attractive its rental network becomes to potential insurer clients, and, in turn, the more MultiPlan can charge for access. For this reason, MultiPlan touts the participation of 1.3 million plus providers in its network as its

---

[14] MultiPlan Corporation, Annual Report (Form 10-K), SEC EDGAR (Dec. 31, 2022).

major "competitive advantage."

119.    To attract providers to its network, MultiPlan must offer competitive payments rates (and other inducements, such as patient steerage). If MultiPlan offers rates (or other terms) that are inferior to what competitor networks offer, it will lose the battle for providers.

120.    In this race for providers, MultiPlan competes against insurers that offer PPO plans and operate their own networks. Many, if not most, of these insurers, including all of the Insurer Defendants, also hire MultiPlan to perform out-of-network claims repricing services (as detailed further below). As MultiPlan states in its public filings, MultiPlan "compete[s] with regional PPOs targeting primary network business,"[15] and "with PPO networks owned by [its] large Payor customers."[16] In other words, MultiPlan and the insurers are horizontal competitors when it comes to PPO provider coverage, and in the markets for provider services. The same horizontal competitors then collude to fix the manner in which providers are paid for their services.

121.    MultiPlan induces healthcare providers to join its PPO network—and to obligate themselves to provide services to patients insured by MultiPlan's payer clients—with the promise of sky-high payment rates. MultiPlan's standard "Participating Provider Agreement" outlines certain "Contract Rates" which are "equal to eighty (80%) percent" of the provider's "[b]ill charges." The rates specified in most standard network agreements are, by contrast, pegged to Medicare rates, and are far lower.

122.    But this promise is illusory. Unlike bona fide network agreements, which contractually obligate insurers to pay specific amounts to doctors for performing covered services, MultiPlan's Provider Participation Agreement includes no payment obligation whatsoever on the

---

[15] Churchill Capital Corp III & MultiPlan, Inc., Virtual Analyst Day (Aug. 18, 2020), https://perma.cc/CK4G-24AC.
[16] *See*, *supra*, note 14.

part of any payer. Instead, it provides that MultiPlan may, "in its sole discretion," rent out its network to insurer clients who may choose not to pay the specified "Contract Rates" and instead opt to reimburse the provider based on the "out-of-Network benefit level" specified in the patient's PPO plan. Specifically, these agreements state:

> [MultiPlan] may, in its sole discretion, include Group and each Participating Professional as a Network Provider in any or all Network(s). Group and each Participating Professional acknowledge that certain Programs offered by [payer] Clients accessing the Network (i) may not include a network option; or (ii) **may cover Covered Services under the Participant's Program at . . . out-of-Network benefit level**.

123.    MultiPlan knows (but does not disclose to providers) that many, if not most, of the claims submitted by participating providers will be reimbursed not at the specified Contract Rates. Instead, these claims will be treated by insurers as out-of-network claims and reimbursed at outrageously low levels that MultiPlan itself sets via its "Data iSight" or Viant out-of-network claims repricing methodologies (which are at the heart of the conspiracy alleged herein).

124.    In fact, MultiPlan ensures as much. Its standard Network Rental Agreement with insurers essentially allows payers to reimburse MultiPlan network providers however they see fit. It provides that the insurer may "pay claims from [providers who participate in MultiPlan's PPO network] in accordance with a Member's [i.e., the patient's] plan of benefits (e.g., benefit plans providing benefit levels at Reasonable and Customary, percentage of Medicare, **or otherwise) in lieu of**" the Contract Rates MultiPlan dangles in front of providers to induce their participation in the MultiPlan network.

125.    Given this reality, MultiPlan's participation agreements with providers may be void for lack of consideration, with providers agreeing to perform services for various insurance plan subscribers with no guarantee of payment. Regardless, a claim submitted by a MultiPlan participating provider that is treated as an out-of-network claim—otherwise known as a "non-

contract" or "retail" claim—is not subject to any contract, much less the MultiPlan Provider Participation Agreement.

126.    Through its network rental business, MultiPlan has aggregated more than 3.5 petabytes of claim and payment data. Such data reflects not only what healthcare providers charge for in-network and non-contracted services, but also what those physicians are willing to accept as payment for those services. MultiPlan refers to this cache of data as the "crown jewels" of its company.[17]

### 2. *MultiPlan 2.0 marked a shift towards claims repricing and the formation of the MultiPlan Cartel.*

127.    Just as Ingenix was being investigated for antitrust violations and fraud in the late 2000s, MultiPlan began offering a new service to its insurance company clients: "re-pricing" their out-of-network (or "non-contracted") claims. This is a euphemism for telling insurers how much to pay providers who perform out-of-network services for their subscribers.

128.    In August of 2009, mere months after the rash of NYAG settlements that would shutter Ingenix, MultiPlan announced that it had reached an agreement to acquire the data analytics firm, Viant, Inc.

129.    Viant, like MultiPlan, operated a rental PPO network; but it also offered "non-network cost management services" and a post-payment audit service. The acquisition of Viant thus "added analytics-based services" and "re-pricing solutions" to MultiPlan's business portfolio. The Viant acquisition was completed in 2010.

130.    In June 2011, MultiPlan acquired another company, National Care Network, LLC ("NCN") for $50 million. Around this time, NCN described itself as a national leader in cost management, boasting powerful data-driven tools and technology solutions. At the time of

---

[17] *See*, *supra*, note 14.

MultiPlan's acquisition, NCN had a patent application pending for a software program that would become central to the MultiPlan Cartel; that program would eventually be known as "Data iSight."

131.    In December 2014, adding to its so-called analytics-based services portfolio, MultiPlan acquired another company called Medical Audit and Review Solutions ("MARS").

132.    Through these acquisitions, MultiPlan became the "leader in out-of-network cost containment." In 2022 alone, MultiPlan processed 546 million out-of-network claims[18]. During that same year, its next closest competitor, Zelis (a company that reprices out-of-network claims based on a UCR benchmark) processed only 2 million out-of-network claims.

133.    Over time, MultiPlan's analytics-based services have contributed an increasing share of the company's annual revenues, now accounting for roughly 70% of total revenues. MultiPlan reported $561 million in 2019 revenues from its analytics-based services, leaping to $713 million by 2022. Meanwhile, MultiPlan's revenues from network-based services dropped from $314 million in 2019 to $245 million in 2022.

134.    For a time, MultiPlan purported to employ several different algorithmic repricing programs, including Viant and Data iSight. However, on information and belief, MultiPlan has consolidated those programs into one. In its 2022 10-K, MultiPlan references Viant only once (in the "corporate history" section) and describes the company's claims re-pricing business as utilizing only one repricing algorithm: the "Data iSight program." Whatever MultiPlan calls its "algorithms" and "solution sets," they all pull data from the same database, operate in the same way, and serve the same function—to facilitate price-fixing in the market for out-of-network provider services.

---

[18] MultiPlan Corporation, Analyst and Investor Day Presentation, New York City (June 28, 2023), https://perma.cc/J87F-M5XM.

**E.    MultiPlan's claims pricing services are designed to fix prices and control payment rates.**

135.    MultiPlan's out-of-network claims repricing services are two-fold: First, MultiPlan makes re-pricing determinations based on its Data iSight or Viant programs; these determinations involve both an algorithmic component as well as direct input from MultiPlan personnel, who work with insurers to choose pricing strategies and algorithmic overrides—i.e., rate caps—to fix and standardize rates, and manipulate the market. Second, MultiPlan negotiates the terms of payment with providers, ensuring that all payments are conditioned on the promise that the provider will not balance bill the patient. As described below, both of these services are important to the MultiPlan Cartel's ability to fix prices for the industry, while protecting cartel members from competitive harms (like subscriber and provider abrasion).

136.    MultiPlan has been open about the effect its anticompetitive price-fixing has on providers. In its investor presentations, MultiPlan openly touts the fact that it helps its competitors systematically underpay healthcare providers. During a fall 2021 investor roadshow presentation, MultiPlan explained to investors that in an illustrative world "Without MultiPlan," a doctor could expect to make $800 on an out-of-network claim, but in an illustrative world with MultiPlan, a doctor would only make $600 on the same out-of-network claim—a 28.6% difference.[19]

137.    In another presentation, MultiPlan claimed that its repricing tool was even more effective, writing that it provided insurers "savings of 61%–81% off billed charges."[20]

*1.    The Data iSight methodology relies on a proprietary algorithm, but it is manipulated to generate artificially low payment rates.*

138.    The precise method by which MultiPlan sets payment rates is non-public and

---

[19] MultiPlan Corporation, Non-Deal Roadshow Presentation Transcript, New York City (Sept. 30 – Oct. 1, 2021), https://perma.cc/KAU3-LBWT.

[20] *See*, *e.g.*, https://perma.cc/K9A8-K2NQ.

proprietary. On information and belief, MultiPlan maintains internal white papers that describe in detail the processes that it uses to reprice out-of-network claims. However, public statements by MultiPlan employees, promotional materials, and U.S. Patent No. 8,103,522 (the "'522 patent," submitted by MultiPlan subsidiary National Care Network, LLC) describe MultiPlan's repricing methodology to some extent.[21]

139.    MultiPlan purports to calculate out-of-network payments based not on a percentage of the prevailing charge rate (i.e., UCR), but on "what people are actually paying within the marketplace" or "typical reimbursement rates." It calls this methodology "Data iSight." Insurers who contract with MultiPlan for repricing services automatically send their out-of-network claims to MultiPlan. Then, for each claim, MultiPlan determines a payment amount based the "amounts generally accepted by providers as payment in full for [like] services."

140.    While MultiPlan dresses up its repricing methodology in technological jargon, it has been forced to admit in legal proceedings that once the algorithm establishes a comparator set, in most cases it simply calculates the "median" payment amount for like services.

141.    According to the '522 patent, the process of establishing a comparator set depends in part on what kind of claim is being repriced. For an inpatient hospital care claim, Data iSight uses rDRG values ("refined Diagnosis Related Groups") as benchmarks. rDRG is a system created by the Center for Medicare and Medicaid Studies ("CMS"); it classifies claims according to type of care, severity, and complexity. When repricing an inpatient claim, Data iSight searches the MultiPlan claims database for other bills for the same rDRG value at other "like" hospitals, then makes a cost adjustment based on the treating hospital's wage index.

142.    For outpatient treatment claims, Data iSight uses the Healthcare Common

---

[21] *See* https://perma.cc/6ERS-BYHV.

Procedure Coding System (or HCPCS), another CMS-developed system. HCPCS is a collection of standardized codes that represent medical procedures, supplies, products, and services used to facilitate the processing of health insurance claims. Data iSight searches the MultiPlan claims databases for other bills for the same services, on a code-by-code basis, and then makes an adjustment based on the wage index where the treatment was rendered.

143.    MultiPlan claims that Data iSight is a highly accurate, fair, and transparent way to calculate rates based on certain reasonable benchmarks. But in reality, MultiPlan ensures that Data iSight always generates artificially low payment rates.

a.    <u>MultiPlan pollutes its database.</u>

144.    MultiPlan (like its predecessor, Ingenix) includes in its dataset payments made pursuant to network agreements. These in-network payments are then fed to Data iSight as comparators, resulting in a "garbage in, garbage out" dynamic. As discussed above, network rates, which are heavily discounted, do not represent reasonable benchmarks for the payment of out-of-network claims because providers would not offer discounts to payers absent the promise of increased patient volume that comes with network participation. By intentionally corrupting its database with heavily discounted in-network payments, MultiPlan intentionally suppresses apparent "typical" or "median" payment levels for out-of-network care.

b.    <u>MultiPlan applies algorithmic overrides.</u>

145.    MultiPlan's supposedly sophisticated algorithm merely identifies the median payment (or other percentile value) amount for like services, based on junk data that MultiPlan feeds its database to suppress those median amounts. However, MultiPlan does not stop there in its efforts to suppress and coordinate industry-wide rates.

146.    For many if not most of its insurer clients (including all of the Insurer Defendants), MultiPlan overrides the algorithm's functioning by instructing payers to enter manual overrides,

45

like caps and floors on payment. These overrides provide MultiPlan an additional means to control and coordinate insurer behavior, thereby reducing member and provider "abrasion" and accelerating the MultiPlan Cartel's goal of suppressing industry-wide out-of-network payment rates.

147.    How does MultiPlan implement these overrides? Under MultiPlan's claims repricing services agreements, each insurer client must complete a "Data iSight Client Preferences form." However, the insurer is not free to independently select these preferences. Instead, the insurer and MultiPlan must "mutually agree[] upon" certain "business criteria" by which to set such preferences. In other words, MultiPlan maintains control over these selections.

148.    The available "business criteria" are seven "methods" for setting rates, which are devised by MultiPlan. Most of these "methods" cap the amount the insurer is willing to pay for a particular service (regardless of what a reasonable payment would be or what the algorithm would otherwise spit out). For example, one available Data iSight "method" is "[r]eimbursement at which X% of hospitals are profitable." Under this method, insurers and MultiPlan decide to reimburse at a level at which 50% of hospitals lose money for the service provided—fair and reasonable indeed. Another method is "[r]eimbursement at X% of Medicare," meaning MultiPlan and the insurer agree to pay no more than a certain percentage of what Medicare pays for a service. The remaining five methods are: "reimbursement at which the average markup is X%"; "reimbursement at X% of cost"; "reimbursement at X% of charges"; "reimbursement at X percentile of billed charges" (i.e., UCR); and "reimbursement at average of billed charges," as shown below in Table 1 of the '522 patent:

| Available Methods | |
|---|---|
| Fl | Reimbursement at which X % of Hospitals are profitable |
| F2 | Reimbursement at which the average mark-up is X % |
| F3 | Reimbursement at X % of Cost |
| F4 | Reimbursement at X % of Medicare Reimbursement |
| F5 | Reimbursement at X % of Charges |
| F6 | Reimbursement at X Percentile of Billed Charges |
| F7 | Reimbursement at Average Billed Charges |

149.    Data iSight uses these "methods" to formulate an "initial target reimbursement amount" irrespective of the "median" (i.e., percentile value) reimbursement rate. This initial target amount largely determines how providers who participate in the MultiPlan network will be reimbursed for claims they submit to MultiPlan's insurer clients.[22] When an insurer receives a claim from a provider that is not part of its own PPO network, the insurer sends the claim to MultiPlan. If the provider is a member of MultiPlan's rental network, MultiPlan calculates the expected payment under that agreement's Contract Rates. But instead of just paying the calculated amount, MultiPlan compares that amount to the "target reimbursement amount," which is essentially an upper limit on payment. If the expected Contract Rate amount is greater than the target, MultiPlan will not pay the Contract Rate and will instead shunt the claim back to Data iSight to be "re-priced" like any other out-of-network claim.

150.    Next, MultiPlan can instruct payers to apply additional overrides to determine the final reimbursement amount. These overrides include additional "ceiling" and "floors," as shown

---

[22] As described above, under MultiPlan's nebulous Provider Participation Agreement, doctors are not guaranteed to receive the enticing Contract Rates outlined by MultiPlan. Instead, their claims may be reimbursed in whatever way the insurer and MultiPlan ultimately see fit. In practice, and as contemplated in MultiPlan's network rental agreements with insurers, this means that the purported Contract Rates will be paid only if such rates are below the insurer's "initial target reimbursement amount," which, on information and belief, rarely occurs.

below in Table 1 of the '522 patent:

| Available Overrides | |
| --- | --- |
| O1 | Don't Pay Less Than X % of Claim's Cost |
| O2 | Don't Pay Less Than X % of Claim's Charge |
| O3 | Don't Pay Less Than X % of Claim's Reimbursement |
| O4 | Don't Pay More Than X % of Claim's Cost |
| O5 | Don't Pay More Than X % of Claim's Charge |
| O6 | Don't Pay More Than X % of Claim's Reimbursement |
| O7 | Don't Pay More Than Billed Charges |

151.    While some of MultiPlan's available "methods" and "overrides" appear to be floors on payment (e.g., "Don't pay less than"), in reality, these apparent "floors" are almost always paired with "ceilings" ("Don't pay more than"). By applying both a floor and a ceiling on payment, MultiPlan and the payer functionally decide the exact level at which to set reimbursement rates.

152.    These agreed-upon payment levels are usually pegged to "barebones" Medicare rates (which do not even cover provider costs)—the long-held goal of the insurance industry. Indeed, between 2019 and 2022, Medicare payments increased by only 7.5% while hospital expenses increased 17.5% over the same period. Overall, for every $100 a hospital spends to treat a Medicare recipient, Medicare reimburses only $84, which is not sustainable. Even Medicare-pegged rates that may sound reasonable can strain medical practices. For example, paying around 120% of the government-set Medicare rate "sounds fair, maybe even generous," one MultiPlan document states, but this is "inherently misleading" because "the average consumer does not understand just how low Medicare rates are." Data iSight's often recommends prices between 160 to 260 percent of Medicare rates, amounts former MultiPlan employees described as "ridiculously low" and "crazy low."[23]

---

[23] *See* NYT Report, *supra*, note 4.

153.    For example, during the process of reaching "mutual agreement" as to the business criteria and overrides to be used to set United's out-of-network payments in 2017, MultiPlan explained that with an "override" of 350% of Medicare rates, United would be "leading the pack," alongside one other competitor, in terms of how low it could drive out-of-network payments. But an override of 500% of Medicare would put United in line with what the rest of what its main competitors were doing. This information about competitor pricing practices was competitively sensitive data that would not have been shared among insurers but for operation of the MultiPlan Cartel. And, consistent with the MultiPlan Cartel's goal of reducing industry-wide out-of-network payment rates over time, United reduced its payment ceiling from 500% of Medicare rates in 2016, to 350% in 2018, and 250% thereafter.

154.    The rate determinations generated by these overrides often do not take into account geographical differences in the cost of key inputs like labor. Numerous providers have observed that MultiPlan reprices claims submitted to United based on a Medicare benchmark, often with no geographical adjustment. For example, Freemont Emergency Services (an emergency room physician group that successfully sued United for suppressing out-of-network payments) documented that between January and May of 2019, it submitted identical claims to United for the same service performed in nine different states. While these bills varied in amount, each was equal to exactly 80% of UCR in the geographical region where the service was performed, as calculated by FAIR at the time. Had these bills been submitted to United during the time in which FAIR was used to set payment rates, each bill would have been paid at exactly the amount charged. But, after having those claims repriced by MultiPlan, United paid these healthcare providers far less. For each of the nine treatments in nine different states stretching from one coast to another, MultiPlan calculated, and United paid, a payment of exactly $413.39. This resulted in an underpayment to

healthcare providers of between $381.61 and $939.61 (or 45% and 70% off of the relevant UCR benchmark).

        2.    *MultiPlan's negotiation services are designed to pressure providers into accepting low payment offers, eliminating the possibility of meaningful negotiation.*

155.    After determining a payment amount via the Data iSight methodology, MultiPlan negotiates payment with providers. This negotiation function is critical to ensuring that all insurers adhere to MultiPlan's payment determinations, and to MultiPlan's ability to orchestrate the conspiracy.

156.    MultiPlan makes offers of payment to providers on a take-it-or-leave-it basis. Typically, MultiPlan gives medical billers less than ten days to respond to its offers and threatens to drop its payments should providers choose not to accept. In one fax to a healthcare provider, MultiPlan gave the provider eight days to respond to a low-ball offer, warning: "if you do not wish to sign the attached proposal . . . this claim is subject to a payment as low as 110% of Medicare rates based on the guidelines and limits on the plan for this patient."

157.    If the medical biller tries to negotiate for a higher rate with MultiPlan, MultiPlan says it is not the insurer and does not have authorization to increase the payment offer. If the biller asks the insurer how MultiPlan reprices its claims, the insurance company explains that it is not responsible for MultiPlan's pricing.

158.    But is not enough to simply force providers to accept the extremely low payment amounts calculated by Data iSight. To avoid patient backlash and subscriber loss for its insurer clients, MultiPlan must also ensure that providers will not hold patients liable for the remainder of the bill. So, MultiPlan conditions all offers of payment on the provider's promise not to "bill the Patient, or financial responsible party, for the difference between the Billed Charges and the Proposed Amount [i.e., the payment offer]."

159.    MultiPlan knows it can get away with acting like mafia enforcer for insurers because virtually every commercial healthcare payer has agreed to use its repricing methodology, leaving healthcare providers with no practical option but to accept the "repriced" payment amount that MultiPlan imposes. Across all claim types, in over 95% of cases, providers accept the initial payment offer made by MultiPlan, and do so, as required, on the condition that they will refrain from balance billing the patient.

160.    MultiPlan "eliminate[s] balance billing" among the miniscule percent of providers who appeal the initial payment offer by providing "post-payment negotiation" services to payers. As part of this service, MultiPlan again tells providers that that if they do not accept the offer, they may receive no payment at all. The vast majority of these appeals result in providers accepting of the MultiPlan offer, again on the condition they will not balance bill the patient.

161.    MultiPlan employees describe an internal culture and incentive structure which discourages them from negotiating reasonable rates with providers. The New York Times reported that employee bonuses are tied to payment reductions. "I knew they were not fair," it quoted former MultiPlan negotiator, Kajuana Young, as saying about the prices generated by MultiPlan.[24]

162.    MultiPlan is not merely making recommendations on how competing payors should pay out-of-network claims. Because MultiPlan and its competitors have agreed on the repricing methodology that will be used, the repricing recommendations generated by MultiPlan's repricing tools are accepted by commercial health insurance payors and offered to healthcare providers without alteration. In most cases, the payor authorizes MultiPlan to make the repricing offer and negotiate the out-of-network claim on its behalf—completely abdicating all pricing authority to its competitor.

---

[24] *See* NYT Report, *supra*, note 4.

163.    MultiPlan's repricing tools are not merely the beginning of a negotiation. On its website, MultiPlan notes that Data iSight repricing is accepted 96% of the time by providers, and 93% of the time by facilities, "making it a defensible methodology for payors."[25] A 2018 MultiPlan study cited even higher numbers: MultiPlan claimed 99.4% of all out-of-network claims for inpatient treatment that are repriced by Data iSight are accepted by healthcare providers. Those acceptance figures were similar for outpatient (98.7%) and professional (94.5%) care.[26] In 2023, MultiPlan's new CEO, Travis Dalton, told the news outlet Axios that 98% of its repriced claims are accepted by providers.[27]

164.    Those high acceptance rates are not due to the validity of MultiPlan's repricing methodology, but rather are the result of the agreement between insurance competitors to fix prices, leaving healthcare providers no alternative but to accept the suppressed MultiPlan repricing offers. In the instances where MultiPlan offers to negotiate its repricing offers, the negotiations are one-sided. Because MultiPlan and its competing payors have agreed not to compete with one another, the question in these negotiations is not whether the healthcare provider will be harmed by the MultiPlan Cartel, but how much. In any event, whether "co-conspirators retain some pricing discretion" or are able to "deviate" from prices is not determinative. Thus, even if MultiPlan's repricing was the beginning of a negotiation (which it is not), it cannot immunize the MultiPlan Cartel's agreement to fix prices.

165.    Indeed, MultiPlan's 30(b)(6) witness testified during a deposition in the *LD, et al. v. United Behavioral Health, et al.*, 4:20-cv-02254-YGR (N.D. Cal.), case that she was unaware

---

[25] https://perma.cc/XAD5-HWY5.

[26] *See* MultiPlan Corporation, A Better Reference for Reference-Based Pricing, MultiPlan Data iSight, Health Plan Alliance (Mar. 21, 2018), https://perma.cc/KC8A-3Z8R.

[27] *See* https://tinyurl.com/ryachfb6.

of a time when United ever rejected a claim price for a particular type of claim. *See LD*, ECF No. 396-8 at 222:21–223:10. Moreover, a United witness in the same case testified that they "leave [the] role and responsibility up to Viant and their team to support and defend how they've arrived at those allowed amounts." *See LD*, ECF. 396-11 at 89:16–20.

166.     Medical practices interviewed by The New York Times confirmed their inability to negotiate over prices generated by MultiPlan.

167.     The New York Times interviewed Tammie Farkas, who handles billing for her husband's small New York-area practice focused on repairing blood vessels in the brain. She said "It's not a real negotiation" when MultiPlan transmits offers of payment on behalf of insurers.

168.     The New York Times further reported that "[i]nsurers can set negotiation parameters for MultiPlan, including not negotiating at all, records and interviews show. . . . Multiple providers and billing specialists said that in recent years they had increasingly been told their claims weren't eligible for negotiation."[28]

> 3.     *MultiPlan's contingent fee structure means they profit directly from lower payment rates paid to providers.*

169.     For each claim MultiPlan reprices, it collects a fee from the insurer based on the difference between the provider's original claim and the amount the provider eventually accepts. This fee is typically equal to 5–7% of the "savings" obtained by MultiPlan but has been as high as 12% in some cases.[29]

170.     MultiPlan is thus highly motivated to calculate the lowest payment rates possible—whether or not "reasonable" or "fair" to the provider. The lowest the payment MultiPlan calculates,

---

[28] *See* NYT Report, *supra*, note 4.

[29] Similarly, in some circumstances, the Insurer Defendants and other Co-Conspirators also collect contingency "savings" fees usually between 29–35% when acting as third-party administers (i.e., when administering self-funded employer plans), from which MultiPlan receives its fees.

the higher its contingency fee is. In other words, the less money that is paid to healthcare providers, the more money MultiPlan makes.

171.    These contingent fees represent the lion's share of the MultiPlan's annual revenues. In 2021 alone, MultiPlan raked in roughly $709 million in fees for repricing out-of-network claims.

## VI.    **Defendants' Anticompetitive Scheme**

172.    A cartel is a group of rivals that conspire to fix prices, allocate markets, or otherwise illegally limit competition. Cartels can be organized by competing sellers of goods or services (who seek to raise prices to increase their revenues) or by buyers (who seek to suppress prices to reduce their costs). Either way, the goal of cartel members is the same: to act (collectively) like a monopolist—or in the case of a buyers' cartel, such as the cartel alleged herein, like a monopsonist.

173.    The MultiPlan Cartel is a buyers' cartel dating back to around 2015 (and perhaps earlier) designed to reduce out-of-network claims payment rates. To achieve this outcome, cartel members agree to: (1) outsource their competitive decisions with respect to out-of-network payment rates to a common decisionmaker, MultiPlan, and abide by its price determinations, and (2) exchange among themselves and MultiPlan competitively sensitive information regarding their payment rates and pricing strategies. This joint delegation and anticompetitive information exchange allows MultiPlan to coordinate insurer behavior and minimize industry-wide payment rates.

### A.    **MultiPlan invites insurers to participate in a collective action to suppress payment rates as part of a horizontal price-fixing conspiracy.**

174.    As a sophisticated market participant, MultiPlan is aware that its out-of-network claims repricing services are attractive to insurers only if insurers perceive an opportunity to collectively adopt the same pricing methodology and negotiation strategy.

175.    It is well understood that a single insurer, acting alone, will face massive subscriber

and provider backlash (or "abrasion") if it reimburses out-of-network claims at below-market, Medicare-style rates. Historically, when insurers refused to pay a reasonable rate of payment on out-of-network claims (and used Medicare rates as the reference point), providers would balance bill patients, leading to subscriber complaints, appeals, and departures.

176.    Insurers thus understand that to successfully lowball providers (without risking serious economic harm), they must not only force providers to accept low payment rates, but to do so on terms that preclude balance billing, something no individual insurer would have sufficient leverage to do on its own. In other words, it would be against the unilateral economic self-interest of any one insurer to join the MultiPlan Cartel, absent awareness that competitors had agreed to do the same.

177.    MultiPlan offers a solution to this dilemma, inviting insurers to act collectively with respect to their payment decisions and provider interactions. To that end, it markets its platform as a way for insurers to "outsource the repricing" and negotiation of "out-of-network claims" to a single decision-maker, MultiPlan. According to MultiPlan, by delegating these functions to MultiPlan, "[c]ommercial plans of any size" can obtain significant "discounts on out-of-network charges" while ensuring "low provider abrasion" and "minimizing the balance billing of their members."[30] Such marketing contemplates and invites concerted action among insurers as a means to reduce out-of-network costs. Insurers sacrifice their independent decision-making to a common decisionmaker (MultiPlan) only because they know competitors are doing the same.

178.    As federal antitrust regulators have explained, "replac[ing] once-independent pricing decisions with a shared algorithm" like the MultiPlan Cartel has done constitutes illegal

---

[30] *See* https://perma.cc/K9A8-K2NQ.

price-fixing.[31] In other words, when "competitor's jointly delegat[e] key aspects of their decisionmaking to a common algorithm," they "deprive the marketplace of independent centers of decisionmaking" and violate Section 1 of the Sherman Act.[32]

179.    The same is true here. The MultiPlan Cartel extinguished this horizontal competition by delegating industry-wide pricing and negotiation authority to MultiPlan. For healthcare providers, this makes independent, individualized payment negotiations impossible. It thereby allows MultiPlan and its Co-Conspirators to dramatically suppress out-of-network payment rates far below what they would have been but-for the MultiPlan Cartel.

180.    As part of this scheme, MultiPlan also invites and requires insurers to participate in anticompetitive information sharing. MultiPlan requires each insurer client to submit real-time, non-public pricing information to its database, including:

(1) claims (both in- and out-of-network) received from providers,

(2) payments to those providers, and

(3) proprietary pricing preferences and strategies, which MultiPlan solicits (among other ways) through its mandatory "Data iSight Client Preferences form."

181.    This pricing information (including the caps and overrides applied by insurers, via mutual agreement with MultiPlan) constitute competitively sensitive information that would not be shared in a competitive market. An insurer equipped with knowledge of a competitor's pricing

---

[31] Hannah Garden-Monheit & Ken Merber, Price fixing by algorithm is still price fixing, FTC Business Blog (March 1, 2024), https://www.ftc.gov/business-guidance/blog/2024/03/price-fixing-algorithm-still-price-fixing.

[32] Statement of Interest of the United States of America at 2-3, *Duffy v. Yardi Systems, Inc.*, et al., No. 2:23-cv-01391 (W.D. Wash. Mar. 1, 2024) (ECF 149); *see also* Statement of Interest of the United States of America at 7, *CornishAdebiyi v. Caesars Entertainment, Inc., et al.*, No. 23-cv-02536 (D.N.J. Mar. 28, 2024) (ECF. 96) (explaining that "[i]t is not necessary for conspirators always to adhere to pricing recommendations for a challenged price-fixing scheme to be per se unlawful.").

data and strategies could gain a competitive advantage and seize market share by reimbursing out-of-network providers at higher rates than a lowballing competitor. It would be against the economic self-interest of any independent insurer to share that competitively sensitive data with MultiPlan, for use with its competitors (whether directly or indirectly), unless it knew that its competitors were doing the same. Absent such an assurance, an insurer would be undermining its competitive standing vis-à-vis other insurers.

182.    MultiPlan is transparent that the value of its services stems from its ability to harvest competitively sensitive payment data from hundreds of insurance companies, and to use that data to set rates for the entire industry. MultiPlan touts its "incomparable database"—populated with some 135 million claims a year, or "360,000 claims a day," from "700-plus payer customers"—as the single most "impressive" fact about the company, and the real reason insurers stand to benefit from the decision to "outsource the pricing of [their] out-of-network claims" to MultiPlan.

183.    As one former MultiPlan executive, Paul Galant, signaled to the market on a 2020 earnings call, MultiPlan's ability to collect "claims from 700 payers" made the company's repricing tools "very, very different" from those operated by a "single payer" (such as Naviguard, United's in-house repricing tool). According to Galant, MultiPlan's access to industry-wide data, rather than its technology, was the reason "why [insurers] all come to MultiPlan" for claims repricing. And he boasted that MultiPlan's "data advantage" had created a "competitive moat around [the] company that drives recurring revenues."[33]

184.    Galant doubled down on these comments during a Virtual Analyst Day later in

---

[33] *See also* MultiPlan Corporation, Non-Deal Roadshow Presentation, New York City (Nov. 19, 2020), https://perma.cc/FW4Z-LDWG.

2020. According to Galant, MultiPlan's value proposition had nothing to do with technology, bluntly stating that anyone can "create their own algorithms." The MultiPlan "difference," he explained, was that "we see data across 700 payors," enabling the company to "generate bigger savings" for clients and to obtain better concessions from providers in negotiations. According to this executive, because MultiPlan can "talk to the entire industry"—rather than just one "specific payer"—it was better equipped to "push for savings" than a payer, acting individually, "who decides to do everything on their own." [34] In other words, MultiPlan could deliver results for insurers because it enabled their collective action.

185.    To attract new cartel members (and ensure the ongoing participation of existing members), MultiPlan regularly announces how many insurers are part of its price-fixing scheme. In 2020, Mark Tabak, then-CEO of MultiPlan, stated publicly that the company was "the leader in out-of-network cost containment" and had entered into "multi-year contracts with the leading payers" to provide out-of-network claims repricing service. Likewise, in 2023, MultiPlan executives bragged that "all of the top 15 insurers" in the country had agreed to use MultiPlan's out-of-network claims repricing services.

186.    MultiPlan makes the same kinds of representations in private to insurers. For example, MultiPlan's former Chief Revenue Officer, Dale White, induced United to join the MultiPlan Cartel in 2016, stating in an email that seven of the insurer's top ten competitors were already using MultiPlan's repricing services. According to the White, "[i]mplementing these initiatives [would] go a long way to bring United back into alignment with its primary competitor group [Blues, Cigna, Aetna] on managing out-of-network costs." One of the recipients of White's email, United executive Rebecca Paradise, would later testify that a key factor in United's decision

---

[34] *See*, *supra*, note 15.

to use MultiPlan was that it was "widely used by our competitors." Such statements confirm that concerted action is the point of the MultiPlan Cartel, and that the Insurer Defendants join it precisely because their competitors have also agreed to do so.

187.    White's email to United was nothing more than an invitation to collude. And it assured United's executives that by joining the collusive scheme, United's out-of-network payments would be "aligned" with those of its competitors, thus enabling the insurer to lowball providers without suffering competitive harms or "abrasion." This same dynamic has played out with countless other insurers.

**B.    Insurers have accepted MultiPlan's invitation to collude, demonstrating their commitment to the scheme in several ways.**

188.    As MultiPlan regularly boasts, over 700 insurers, including all of the nation's top 15 healthcare payers, have accepted MultiPlan's invitation to participate in concerted action with respect to the pricing of out-of-network claims. These insurers show their acceptance of MultiPlan's invitation to collude in at least three ways.

*1.    Insurers delegate their pricing decisions to MultiPlan through contractual agreements, relinquishing control over key business decisions.*

189.    First, insurers enter into contracts with MultiPlan through which they delegate to MultiPlan the authority to determine out-of-network payment rates and negotiate those rates with providers to ensure they accept them. The very act of contracting with a common third party to determine rates and negotiate with providers signals insurers' conscious commitment to adhere to MultiPlan's price determinations, facilitating their collective action.

190.    Under MultiPlan's out-of-network claims repricing services contracts, insurers agree to set payment preferences through "mutual[] agree[ment]" with MultiPlan, and abide by MultiPlan's "negotiated rates" so long as they are "consistent with the business criteria mutually

agreed upon between [the insurer] and MultiPlan." Through these provisions, insurers delegate to MultiPlan control over key business decisions that directly impact payment rates. The fact that all of MultiPlan's insurer clients cede control to MultiPlan in this way enables MultiPlan to orchestrate uniform behavior by each of its insurer clients to achieve their common, illicit goal of suppressing payment rates across the board—a goal from which MultiPlan profits handsomely.

191.    By outsourcing their independent decision-making and negotiation authority to a mutually agreed-upon third party, insurers know that they will not (and cannot) be disciplined by providers for setting ever-lower payment rates. Providers are forced to accept unprecedentedly low payments rates, without recourse to balance billing, because virtually all insurers now use MultiPlan's out-of-network claims repricing services. In other words, healthcare providers have nowhere to turn for better terms, and must deal with MultiPlan or receive no payments at all (and rely solely on payments from patients).

2.    *Insurers share sensitive data with MultiPlan, granting it access to proprietary information that would not be shared in a competitive market.*

192.    Second, insurers provide MultiPlan with copious amounts of competitively sensitive data, including their payment data and payment preferences (including the overrides and caps they enter into Data iSight).

193.    Insurers share this data with MultiPlan because they know that MultiPlan will use it to assist them and their co-conspirators (including through the setting of out-of-network payment rates and the effectuation of pricing strategies). They also participate in information sharing so that they can benefit from the proprietary data their competitors are likewise providing to MultiPlan.

194.    MultiPlan's relationship with United illustrates how the company leverages insurers' proprietary payment data and pricing strategies to effect its scheme to suppress industry-wide out-of-network prices:

195.    In 2016, MultiPlan induced United to join the MultiPlan Cartel by representing that its major competitors had already entered into repricing services agreements with MultiPlan. In 2017, MultiPlan instructed United to pursue a specific, aggressive override strategy, based on what MultiPlan's other insurer clients were doing, that would drive down industry-wide payment rates. In particular, MultiPlan's Dale White instructed that United set out-of-network payments at 350% of Medicare rates, assuring United executives that, by agreeing to use this formula, United would "be in line with [one] competitor" and "leading the pack along with another competitor." MultiPlan was aware of the pricing strategies of United's competitors because, as MultiPlan clients, they had set those benchmarks via "mutual agreement" with MultiPlan. MultiPlan then used that information to make a similar instruction to United. Thus, MultiPlan's role as a clearinghouse for each Insurer Defendant's and each co-conspirator's competitively sensitive and otherwise non-public pricing data is essential to its ability to orchestrate the MultiPlan Cartel, and to bring each Insurer Defendant's and each co-conspirator's practices in alignment with the cartel's overall pricing moves.

196.    Against this backdrop, United's pricing became increasingly aggressive over time, backed by MultiPlan's assurances that its out-of-network payments were still consistent with industry norms. Eventually, United agreed with MultiPlan to implement a cap of 250% of Medicare rates in Data iSight. As United executives later explained in a Customer Impact Advisory Brief, it was "utilizing Data iSight, owned by MultiPlan, to administer [an outlier cost management program]" and "90 other payors nationwide use [Data iSight] in a similar manner." United's agreement to MultiPlan's proposed cap thus turned on its understanding that its competitors had already entered similar agreements with MultiPlan. Absent that assurance, it, like its competitors, would not enter such an agreement because it would be against their independent economic

interests.

197.    MultiPlan has leveraged its access to insurers' proprietary data and preferences to orchestrate similar agreements with each of the largest health insurance companies in the United States, which would otherwise be competing amongst themselves for the services of out-of-network providers by paying market rates.

### 3.    Insurers adhere to MultiPlan's pricing determinations, effectively accepting its pricing as the final word for out-of-network claims.

198.    Third, insurers abide by MultiPlan's price determinations. MultiPlan enforces this outcome through its contracts with insurers. Pursuant to MultiPlan's standard out-of-network claims repricing services contract, the insurer cannot set their payment rates as they see fit. Pricing preferences can only be entered by "mutual agreement" with MultiPlan. Moreover, the insurers' ability to deviate from the Data iSight rate is constrained, as each insurer agrees "not to reduce the . . . provider's rate for claims for which [MultiPlan] has negotiated a rate . . . provided that the negotiated rate is consistent with the business criteria mutually agreed upon between [the insurer] and MultiPlan." The business criteria set by insurers are also informed by MultiPlan's access to and divulging of the competitively sensitive information of other insurers. Because it would be economically irrational for an insurer to pay more than a healthcare provider was willing to take, the bar on reducing a provider's rate below what MultiPlan has determined constitutes a tacit agreement by the insurer to pay exactly what MultiPlan instructs it to pay.

199.    This tacit agreement is borne out in practice. MultiPlan processes some 370,000 claims per day for its clients. Given this volume, insurers cannot (and do not) independently assess whether MultiPlan's algorithmically adjusted rates are reasonable. Instead, virtually all MultiPlan-generated rates are sent to providers (usually by MultiPlan itself) with no modification whatsoever on the part of the insurer (or any other form of "human touch").

200.    In some 95–99% of cases, providers accept the MultiPlan generated rates initially offered, on the condition that they will "not . . . bill the Patient, or financially responsible party [i.e., the patient], for the difference between the Billed Charges and the Proposed Amount [offered]."

201.    As a result, the MultiPlan rate determination is the final payment amount in virtually all cases.

**C.    The MultiPlan Cartel operates as a "hub-and-spoke" conspiracy, with MultiPlan coordinating an agreement between insurers to fix prices for out-of-network services.**

202.    The MultiPlan Cartel is also a "hub-and-spoke" conspiracy that is per se illegal under the Sherman Act. Under this mode of analysis, MultiPlan is the "hub" of the conspiracy and the Co-Conspirator insurance companies' agreements with MultiPlan to reprice their claims are the "spokes." The "rim" of the conspiracy is the agreement between the Co-Conspirator insurance companies to use MultiPlan's repricing methodologies to suppress out-of-network payments.

203.    Prior to the Co-Conspirators joining the MultiPlan Cartel, commercial health insurance providers made several attempts to underpay healthcare providers through unilateral action. For example, before it joined the MultiPlan Cartel in 2017, in May 2015, United paid $11.5 million to resolve claims that it used down-coding software algorithms, stalling tactics, and other unfair business practices to underpay healthcare providers in Connecticut, New York, North Carolina, and Tennessee. Likewise, in September 2015, United agreed to pay $9.5 million to settle claims that it systematically underpaid out-of-network claims in California. However, these unilateral efforts could be thwarted by healthcare providers, because the providers could elect to provide non-emergency care to patients from other health insurance networks.

204.    Commercial health insurance companies realized the need for collective action. Initially, United attempted to solve that collective action problem using its subsidiary, Ingenix.

However, when the New York State Attorney General shut down the Ingenix scheme, commercial health insurers needed a new way to agree among themselves to underpay out-of-network claims.

205.    MultiPlan solved that problem. It advertised itself to insurance companies as a hub that could be used to collectively reduce out-of-network payments to healthcare providers. As MultiPlan told its investors, using MultiPlan is a "much better mechanism" for payors to collectively slash payments "versus doing it themselves." According to MultiPlan, this is because "if a pay[o]r decides to do everything on their own, their ability to go back to providers and push for savings is fundamentally different than ours. [W]e can talk to the entire industry."[35]

206.    For example, as noted above, MultiPlan told United that many of United's competitors were using MultiPlan's repricing services to slash out-of-network payment rates. MultiPlan further advised United on the pricing levels and methodologies adopted by its competitors. It told United that prices set at 350% of Medicare rates would "be in line with another competitor" and "leading the pack along with another competitor." MultiPlan eventually reached an agreement to reprice United's claims which put United, in its own words, in the "middle of the pack of its peers." Thus, one spoke of the conspiracy was formed—the agreement between MultiPlan and United to suppress out-of-network payments in reference to their competitors' pricing levels and methodologies.

207.    MultiPlan persuaded the vast majority of large competing health insurance companies to become "spokes" in the conspiracy through similar inducements. MultiPlan has contracts with the "top 15" health insurance payors in the nation and agreements with over 700 insurance payors to reprice their claims. Each of these contracts between a health insurance payor and MultiPlan forms another "spoke" in the MultiPlan Cartel's "hub-and-spoke" conspiracy.

---

[35] *See*, supra, note 15.

208.    MultiPlan uses similar tactics to facilitate collusion along the rim of the alleged hub-and-spoke conspiracy. MultiPlan informs each of the payors that other major payors are using MultiPlan's repricing services to suppress out-of-network claims, that those payors are generating substantial revenues by underpaying out-of-network claims, and that the payor can bring itself into "alignment" with the rest of the industry and be in the "middle of the pack" on out-of-network claims suppression by working with MultiPlan.

209.    Thus, each of the payors knows that its competitors have considered or are considering the same terms offered by MultiPlan—i.e., suppressing out-of-network claims payments and splitting the revenues generated by doing so. Each payor has a strong motive to enter into the conspiracy because they know that without substantially unanimous action, agreeing to unilaterally cut out-of-network payments would be economically self-defeating. And, in the end, each payor agrees to the same course of conduct (suppressing out-of-network claims via an agreement with MultiPlan), which constitutes an important departure from their prior practice of using UCR or FAIR benchmarks to compete against one another on out-of- network payments.

210.    Importantly, there is no valid business reason for each of MultiPlan's Co-Conspirators to have entered into agreements with MultiPlan to cut payments to out- of-network healthcare providers. Larger payors could have created their own in-house repricing tools (and some came close to doing so). Smaller payors could have used the FAIR benchmark to reprice claims. The only plausible explanation for every healthcare payor of any consequence agreeing to use MultiPlan's out-of-network claims suppression methodology is that MultiPlan provided them with assurances that they could agree to do so with the common understanding that they would not be undermining one another via competition on payment rates.

211.    As discussed above, there is extensive circumstantial evidence that health insurance

companies have agreed with each other to use MultiPlan's "repricing" methodology to suppress out-of-network payments to healthcare providers, thus forming the "rim" of the conspiracy. This includes evidence that MultiPlan facilitated a parallel transition among insurance companies from a competitive regime to a coordinated regime, and a variety of "plus factors" that tend to exclude the possibility that this parallel conduct was the result of independent action.

### D.  There direct evidence of the MultiPlan Cartel's existence.

#### 1.  *Contracts between MultiPlan and the Insurers evidence the MultiPlan Cartel conspiracy.*

212.    MultiPlan has entered agreements with some 700 insurers, comprising nearly every commercial payor in the United States, including the Insurer Defendants, which expressly contemplate that MultiPlan and the insurer will collude to set the payment levels for out-of-network claims. These contracts include an agreement to share proprietary data, to use MultiPlan's repricing technologies to lower payments made on claims for payment by out-of-network healthcare providers, and to allow MultiPlan to negotiate rates with providers to eliminate balance billing. Several of these contracts are publicly available.

213.    Despite MultiPlan's efforts to keep many of these agreements out of the public eye, many facts concerning those agreements are publicly known. Some versions of MultiPlan's contracts with competing healthcare payors contain an exhibit or amendment entitled "Repricing Services" that allows the competing payor to route its out-of-network claims to MultiPlan for repricing via a direct electronic data interchange or a web-based interface. The contract also specifies the repricing method to be used. Thus, MultiPlan and its competitors have entered into agreements that explicitly discussed the methodology they would use to suppress payments for out-of-network services to healthcare providers.

214.    One agreement between MultiPlan and Aetna, for example, provides that the parties

must mutually agree upon pricing preferences, and that Aetna will honor rates negotiated by MultiPlan so long as they are "consistent with the business criteria mutually agreed upon between [Aetna] and [MultiPlan]." The parties also agree "[w]here the negotiated amount is less than the original billed charge," MultiPlan must "obtain the provider's signed agreement to the revised amount or secure proper documentation stating no 'balance bill' to the patient except for deductible, co-insurance and non-covered services based on the providers' adjusted price[.]"

215.    In 2014, Cigna and MultiPlan entered into a Master Services Agreement, which has been amended several times to include statements of work and addendums. On April 1, 2015, Cigna and MultiPlan entered into Statement of Work No. 4. This Statement of Work covered repricing of inpatient and outpatient services and repricing using MultiPlan's Data iSight product.

> 1.    **Scope of Work**
>
> 1.1    Services
> Supplier shall provide the following Services in accordance with the terms and conditions of the Agreement to Company: medical review analysis, including but not limited to, Inpatient Repricing Services (IPR), Outpatient Repricing Services (OPR) and DataiSight (DiS) Repricing Services, (collectively, "Medical Review Analysis" (MRA)) in accordance with all regulatory requirements and guidelines and as defined and described below.

216.    The publicly filed version of the Cigna Statement of Work is redacted and does not reflect the percent of savings MultiPlan gets paid on repriced claims.



217. The Statement of Work No. 4 is dated April 1, 2015, but, on information and belief, was not made public until November of 2023 when it was filed as an exhibit in *TML Recovery, LLC et al. v. Cigna Corporation, et al.*, 8:20-cv-00269-DOC-JDE (C.D. Cal.).

218. Similarly, Asuris Northwest Health, Regence Blue Shield, Bridgespan Health Company, Regence Blue Cross Blue Shield of Oregon, and Regence Blue Cross Blue Shield of Idaho entered into agreements with MultiPlan that address the repricing of out-of-network medical services. Information about the agreements was not made public until it was filed with the Washington State Insurance Commissioner in 2022 and 2023.

219. Other members of the MultiPlan Cartel have entered similar agreements with MultiPlan to access both its rental PPO networks and its out-of-network claims repricing services.

220. MultiPlan has taken steps to keep its agreements with competing health insurance payors a secret. For example, MultiPlan has a Service Agreement with Allied National, Inc. ("Allied") under which Allied utilizes MultiPlan's repricing methodology. The Service Agreement between MultiPlan and Allied states that it is "Confidential Not For Distribution." The Service Agreement also contains a Confidentiality and Proprietary Rights provision, which defines "Confidential Information" to include information relating to MultiPlan's repricing services and

methodologies. The Service Agreement prohibits Allied from using that Confidential Information for any reason other than using MultiPlan's repricing services. When Allied filed a third-party complaint in *Butler v. Unified Life Insurance Company, et al.*, Case No. CV 17-50 (D. Mont. Nov. 18, 2021) that contained three paragraphs that disclosed information regarding MultiPlan's repricing services, MultiPlan sued Allied for disclosing that information. Ultimately, Allied removed its filing from the docket and redacted those paragraphs in its third-party complaint.

221.    Upon information and belief, MultiPlan has entered into additional contracts with many competing commercial health insurance companies that require MultiPlan's competitors to use its out-of-network claims suppression technology.

2.    ***Public statements and communications from MultiPlan and the Insurers acknowledge the existence of these agreements and the overall schemes.***

222.    Members of the MultiPlan Cartel have admitted to the existence of their agreements to suppress out-of-network payment claims in communications with healthcare providers and the public.

223.    MultiPlan is a horizontal competitor of the Insurer Defendants, a fact which flows from its position as a nationwide PPO network operator. According to MultiPlan, it operates "the oldest and largest independent Preferred Provider Organization (PPO) network" in the United States. Even as MultiPlan expanded its business from PPO networks into analytic "repricing" tools, as described below, it continued to operate its PPO networks. In 2022, it again claimed to operate "the largest primary PPO in the nation."[36]

224.    As described above, to attract providers to its rental network, MultiPlan must offer them competitive payments rates (and other inducements, such as patient steerage). If MultiPlan offers rates (or other terms) that are inferior to what competitor networks offer, it will lose the

---

[36] *See* https://perma.cc/36SD-9QE3.

battle for providers.

225.     In this contest for providers, MultiPlan competes against insurers that offer PPO plans, including the Insurer Defendants. Thus, as MultiPlan has admitted in public filings, MultiPlan "compete[s] with regional PPOs targeting primary network business," and "with PPO networks owned by [its] large Payor customers."[37] Indeed, MultiPlan's executives have been forced to admit under oath that MultiPlan is a health insurance payor. As Marjorie G. Wilde, Senior Counsel for MultiPlan, explained in a declaration filed in *Jonathan Hott, M.D. v. MultiPlan, Inc.*, Case No. 1:21-cv-02421-LLS (S.D.N.Y. Aug. 15, 2022) (ECF 38-2 ¶¶ 3–4):

> MultiPlan provides healthcare cost management services and operates a networkonly preferred provider organization ("PPO") that does business nationwide by contracting, on the one hand, with healthcare providers, such as hospitals, physicians, physician groups and ancillary providers ("Network Agreements"). These contracted providers agree to give discount off of medical services rendered to the beneficiaries of clients of MultiPlan. . . . On the other hand, MultiPlan also contracts with its clients, which include health insurance carriers, health maintenance organizations, self-funded health plans, third party administrators, and other third-party payors that have members and beneficiaries who receive medical services from the provider network assembled by MultiPlan.[38]

---

[37] *See*, *supra*, note 13.

[38] In related litigation, MultiPlan has claimed that it is not a payor and does not compete against other payors. *See* Memorandum of Law in Support of Motion to Dismiss at 12, *Adventist Health System Sunbelt Healthcare Corporation v. MultiPlan, Inc.*, 1:23-cv-07031 (S.D.N.Y. Dec. 12, 2023) (ECF 65) (MultiPlan arguing that it does not "pay[] healthcare claims"). That is false. In October 2020, the Centers for Medicare and Medicaid Services ("CMS") finalized a rule known as the Transparency in Coverage Rule. Among other things, the rule requires group health plans and health insurance issuers to make available information on their websites in a machine readable format concerning their negotiated rates with in-network providers and historical billed charges and allowed amounts. In April 2022, in accordance with the rule, MultiPlan produced network rate files for its PHCS network, Beech Street network, HealthEOS network, HMA network, and MultiPlan network. MultiPlan also produced out-of-network allowed amounts and billed charges to its MultiPlan network, Beech Street Network, and IHP network. MultiPlan made similar machine-readable files available again in December 2023. In other words, MultiPlan admits that it is covered by regulations concerning group health plans and issuers of health insurance and complies with those regulations.

226.    MultiPlan's public statements concede the existence of its agreements to suppress out-of-network payments with its competitors. On August 18, 2020, MultiPlan's then-CEO Mark Tabak described MultiPlan as "the leader in out-of-network cost containment." As Mr. Tabak explained to investors, MultiPlan has entered into "multi-year contracts with the leading payors," i.e., health insurance companies, to provide this service. He stated that MultiPlan drives down out-of-network payments by "captur[ing] [out-of-network] claims" from competing health insurance networks that contract with MultiPlan for its claims repricing services. MultiPlan then "direct[s]" those claims "to the proper solution set." While these "solution set[s]" may vary in name, they all serve the same function: to set out-of-network payment rates at agreed-upon levels or by using an agreed-upon methodology.[39]

227.    The Co-Conspirators' plan disclosures also reflect the existence of the agreements between competitors. For instance, Aetna's May 2022 disclosures state that MultiPlan is one of its external pricing vendors and that it will use Data iSight to price out-of-network claims, including using a MultiPlan "advocate" to negotiate with providers on a member's behalf. United also provides a disclaimer regarding out-of-network providers in which it states that one methodology that may be used to establish the payment amount for out-of-network claims is Viant.

       *3.*     *Internal communications between MultiPlan and Insurer Defendants expose the inner workings of the cartel, revealing how they coordinate pricing and share information.*

228.    MultiPlan's communications with members of the MultiPlan Cartel shows how the price-fixing conspiracy unfolds in practice. They show that MultiPlan discloses pricing levels among competitors, recommends that they adopt parallel pricing, and then implements that pricing by taking over the Co-Conspirators' price-setting and price-negotiation functions.

---

[39] *See*, *supra*, note 15.

229.    United is the single largest health insurance company in the United States. Beginning on July 1, 2017, United and MultiPlan entered into an explicit agreement to suppress out-of-network health insurance payment prices.

230.    United and MultiPlan implemented this agreement on or around July 1, 2017 by means of an Amendment to the Network Access Agreement (originally entered by United and MultiPlan on January 1, 2010).

231.    MultiPlan began recruiting United into the conspiracy several years earlier. On or around October 1, 2015, MultiPlan sent United a presentation entitled, "Data iSight: Maximize Savings Using a Patented Methodology." This presentation argued that United would substantially increase its revenues if it stopped independently pricing out-of-network payments to healthcare providers and used MultiPlan's pricing methodology instead.

232.    MultiPlan induced United to join the MultiPlan Cartel by explaining that United's competitors had already entered into similar agreements with MultiPlan and by disclosing the pricing levels adopted by those competitors. In 2016, MultiPlan's former Chief Revenue Officer, Dale White, wrote an email to United executives, explaining that 7 of United's top 10 competitors were using MultiPlan's repricing services. Mr. White encouraged United to do the same, writing: "Implementation of these initiatives in 2016 will go a long way to bring United back into alignment with its primary competitor group [i.e., Blues, Cigna, Aetna] on managing out-of-network costs."

233.    One of the recipients of Mr. White's email, Rebecca Paradise, United's Vice President of Out-Of-Network Payment Strategy, explained that a key factor in United's decision to agree to use MultiPlan's out-of-network payment suppression technology was that the technology "was widely used by our competitors."

234.    Mr. White, MultiPlan's Chief Revenue Officer at the time, relayed to another

United executive, John Haben, that by agreeing to use the 350% of Medicare rates formula in Data iSight, United would "be in line with another competitor" and "leading the pack along with another competitor."

235.    Haben subsequently wrote in an internal United email: "If we implement benchmark pricing as described, with the intent to reduce the threshold to 350 percent CMS, United would be leading the pack along with a major competitor." In that email, Haben referred to "350 percent CMS" as "recommended benchmark pricing."

236.    On April 21, 2016, Emma Johnson, the Director of Sales and Account Management for National Accounts at MultiPlan, sent an email to Sarah Peterson (Director of Network Programs, United), Marie Rickmyer (Program Manager for United Out-of-Network Affordability), and Amy Barker (Associate Director of Claims at United) entitled, "Data iSigt HCFA nd [sic] UB ER [GRI and UNET] and other questions." In the email, Ms. Johnson sought agreements from United on the price that MultiPlan's Data iSight pricing methodology would set for certain emergency room claims provided to MultiPlan via United's UNET claims processing system and claims underwritten by United's Golden Rule Insurance Co. ("GRI") affiliate. In the email, Ms. Johnson wrote: "Please confirm your agreement" that pricing for certain emergency room claims "would be 350% of [Medicare] or the [Data iSight] rate whichever is greater" (emphasis added). United subsequently agreed with MultiPlan to set its pricing for those emergency medical services claims at 350% of Medicare rates.

237.    In a September 8, 2016 email to Lauren Paidosh (another United employee), John Haben, the United executive, indicated specific knowledge of competitors' pricing formulas adopted through Data iSight. He wrote: "MultiPlan said seven of our top ten competitors use the tool today." He continued: "BCBS [Blue Cross Blue Shield] is even more aggressive and is

accessing the option of moving DIS [Data iSight] up even higher to have IPR/OPR (R&C repricing) which is option 3." In this email, Mr. Haben demonstrated specific knowledge of the pricing "option" adopted by United's competitive rival, Blue Cross Blue Shield, in MultiPlan's Data iSight program.

238.    Mr. Haben conceded that this knowledge of Blue Cross Blue Shield's pricing formula came from MultiPlan. He was asked under oath: "Did the information that MultiPlan shared with you to be passed along to Ms. Paidosh play any role in your views about whether you would be comfortable using this product?" He answered: "my goal of informing her, from what I remember, is to inform the organization we are going to move forward with MultiPlan, and just giving them the heads up of our progress."

239.    Mr. Haben summarized MultiPlan's recommendation in a 2017 email and presentation he sent to senior management at United entitled "OCM [Outlier Cost Management] MultiPlan Benchmark Pricing Overview." In the email, Mr. Haben wrote, "[t]oday, our major competitors have some sort of outlier cost management; they use Data iSight. United will be implementing July 1, 2017."

240.    In the same email, Mr. Haben explained that the agreement between United and MultiPlan could "improve"—i.e., cut—United's out-of-network claim payment "by $900 million" per year.

241.    Haben wrote in a 2017 United internal presentation about implementing MultiPlan: "By implementing Outlier Cost Management as currently planned, United catches up to the pack, but not leading."

242.    United signed an Amendment to its Network Access Agreement with MultiPlan that stated that United would send out-of-network claims to MultiPlan via an electronic data

interchange, MultiPlan would use its pricing methodology to "reprice" those submitted claims, MultiPlan would take over the negotiation of those submitted out-of-network claims, and finally United and MultiPlan would split the revenue generated by underpaying providers for their out-of-network claims.

243.    Mr. Haben later testified that United initially agreed with MultiPlan to suppress out-of-network claims in a less aggressive manner that put United in the "the pack of its peers."

244.    Over time, United became more aggressive and agreed with MultiPlan to implement lower payment formulas in Data iSight, consistent with others in the industry.

245.    United wrote in a Customer Impact Advisory Brief that it was "utilizing Data iSight, owned by MultiPlan, to administer [an outlier cost management program]. 90 other payors nationwide use [Data iSight] in a similar manner."

246.    United tracked the amount of money that it underpaid healthcare providers using "OCM," its internal term for claims that were routed to Data iSight. United employees prepared a table with a column entitled "No OCM," meaning the additional amount that United would have paid on out-of-network claims had United not agreed with MultiPlan to use MultiPlan's Data iSight product to suppress out-of-network payment. That internal analysis shows that United's agreement with MultiPlan resulted in United paying hundreds of millions of dollars less in out-of-network claims than it would have without its agreement with MultiPlan.

247.    MultiPlan and United continued to meet and communicate with one another to fine-tune the details of their agreement on out-of-network pricing and to use MultiPlan's proprietary pricing methodology. On March 13, 2018, MultiPlan officials met with United. During this meeting, MultiPlan provided a presentation entitled, "MultiPlan Update for UnitedHealthcare: 2017 in Review." During this presentation, MultiPlan noted that the agreement between MultiPlan

and United had successfully suppressed out-of-network payments to healthcare providers and suggested ways to pay providers even less.

248.    After instructing competing commercial payors on how to be in "alignment," MultiPlan pushed the MultiPlan Cartel to cut out-of-network payment rates. For example, in a September 29, 2019 presentation to United entitled "Competitive Landscape for Cost Management," MultiPlan told United that it was up to 10 years behind its competitors in terms of cutting out-of-network payments to healthcare providers and urged United to cut its payment rates further. This meeting was attended by Mr. Haben, who took contemporaneous notes of the meeting, which he sent to Rebecca Paradise, the Vice President of Out-of-Network Strategy for United.

249.    During 2019, United agreed to further suppress out-of-network pricing for emergency room claims. Starting in March 2019, MultiPlan and United agreed to cut payments for emergency room services from 350% of Medicare pricing to 250% of Medicare pricing. That price cut was rolled out to providers throughout 2019.

250.    Scott Ziemer, Vice President of Customer Solutions–Network at UMR (a United subsidiary), testified under oath that MultiPlan recommended that United use a repricing formula that capped out-of-network payments at 250% of Medicare rates. Mr. Ziemer further admitted that "we [United] don't give . . . instruction" to MultiPlan regarding what prices to set, and instead simply "rely" on MultiPlan's algorithm to determine the payment amount.

251.    The fact that MultiPlan and United agreed to use a percentage of Medicare pricing to set out-of-network prices is particularly significant. MultiPlan and United knew that this was a way to make out-of-network pricing seem justified when what they were actually doing was agreeing to a substantial cut relative to the prior FAIR and UCR out-of-network prices that

predominated prior to the MultiPlan Cartel. In a secret August 2019 white paper that was disseminated to United and others, MultiPlan confided that Medicare-referenced pricing was "inherently misleading" because most people "do[] not understand how low Medicare rates are." The white paper continued, "[t]he gap between [billed charges] and the barebones Medicare reimbursement can be significant." Thus, not only did MultiPlan and United agree to fix prices, they did so in a way that they knew was intentionally misleading and would generate significant underpayments for providers.

252.    MultiPlan routinely shares these white papers with other members of the MultiPlan Cartel. For example, on January 1, 2019, MultiPlan sent a copy of its "Data iSight Professional Methodology" to United. Similarly, in 2016, MultiPlan sent copies of white papers entitled "Data iSight Product and Methodology Inpatient Module," "Data iSight Product and Methodology Outpatient Module," and "Data iSight Product and Methodology Physician Module." Similar white papers also exist for MultiPlan's Viant methodology.

253.    Sean Crandell, MultiPlan's Senior Vice President of Healthcare Economics, *admitted that MultiPlan's pricing methodology ended out-of-network pricing competition*. Under oath, he testified as follows:

> Q. During the same time period, 2017 to 2020, was the out-of-network pricing recommended by Data iSight to United the same or different as that recommended to UnitedHealthcare's competitors?
>
> A.    It was the same.

254.    In the same testimony, Crandell was asked "if the Data iSight tool is used among various different companies in the industry, do the recommended payment rates generated by Data iSight tool vary depending on which client you're running that calculation for?" Crandell answered: "No."

255.    The attorney conducting the examination followed up: "can the tool even factor in

who the client is?" Crandell answered: "No, it can't. The system that generates the methodology cannot even factor in the client."

256.    The same pattern that transpired with United also occurred with Cigna. In March 2016, officials from MultiPlan and Cigna met to discuss ways that they could work together to reduce out-of-network payments. During this "Non-Par Strategy Summit," Cigna displayed a slide deck that outlined how the company planned to work with MultiPlan to slash its out-of-network payments. Among others, this meeting was attended by Terri Cothron, Cigna's Manager of National Ancillary & Non-Par Management, who was responsible for overseeing Cigna's contractual relationship with MultiPlan.

257.    In advance of that meeting, MultiPlan sent Cigna an email with an attached presentation entitled, "2016 Network Development Meeting: A Client's Perspective on Out-of-Network Costs." The presentation outlined how Cigna could redirect billions of dollars in out-of-network claims from providers to itself and MultiPlan. During the March 2016 "summit," a MultiPlan representative explained how its proprietary pricing methodology (at that time, marketed under the brand names Viant and Data iSight) worked and how it could significantly lower payments to providers for out-of-network claims.

258.    After attending MultiPlan's presentation at the March 2016 summit meeting, Ms. Cothron confided to a co-worker that MultiPlan's Data iSight and Viant pricing methodology, "scares me."

259.    Nevertheless, Cigna contracted to use MultiPlan's pricing methodology for Cigna's out-of-network claims shortly thereafter. Cigna used internal "Whitebook Reports" to keep track of how much money it earned by underpaying providers using MultiPlan's pricing methodology. Those reports contain line items for each out-of-network claim and the corresponding amount of

"savings" generated by using MultiPlan's pricing methodology.

260.    Privately, MultiPlan crowed about how successful its agreement with Cigna was in cutting payments to providers for out-of-network claims. In a slide deck entitled, "Cigna & MultiPlan Governance Meeting, June 21, 2021," MultiPlan outlined that it had worked together with Cigna to cut payments to providers for out-of-network claims.

261.    MultiPlan has entered into similar agreements with each of the largest health insurance companies in the United States, who would otherwise be competing amongst themselves.

262.    As of June 2023, MultiPlan touts that "all of the top 15 insurers" in the country have agreed to use MultiPlan as their pricer for out-of-network claims.

263.    Each of those "top 15" insurers compete with MultiPlan's PPO networks to attract healthcare providers to become in-network and to induce healthcare providers to treat out-of-network patients through the payment of competitive payment rates.

264.    Recent reporting by The New York Times confirmed that MultiPlan coordinates a price-fixing conspiracy among the major commercial health insurers. Its April 7, 2024 exposé stated: "As MultiPlan became deeply embedded with major insurers, it pitched new tools and techniques that yielded even higher fees, and in some instances told insurers what unnamed competitors were doing, documents and interviews show." The New York Times quoted Lisa McDonnel, a United executive, as writing in an internal email that "Dale did not specifically name competitors but from what he did say we were able to glean who was who," referring to Dale White, the former CEO of MultiPlan.[40]

265.    MultiPlan also engages in "road shows" in which it travels to competing insurance

---

[40] *See* NYT Report, *supra*, note 4.

companies and provides updates on the claims repricing methodologies adopted by MultiPlan's customers and their competitors.

266.    MultiPlan executives Dale White and Susan Mohler are involved in these "road show" presentations, wherein MultiPlan produces detailed descriptions of Data iSight's methodology, reviews the "savings" achieved for MultiPlan's customers, and recommends ways to further suppress out-of-network payments.

267.    MultiPlan prepares white papers for its claims repricing clients and Co-Conspirators, which are essentially user's manuals instructing them on how to implement the scheme. These white papers include references to the claims repricing methodologies adopted by horizontal competitors.

        *4.     A U.S. Patent filed by a MultiPlan subsidiary explicitly details how the company and its insurer clients agree on a methodology to suppress out-of-network payments.*

268.    MultiPlan has obtained a U.S. patent, the 522 patent, that describes its repricing methodology. That patent explains that MultiPlan and competing health insurance networks are explicitly agreeing on the methodology that will be used to calculate and suppress out-of-network payments. Specifically, the patent explains that MultiPlan's customers (i.e., competing healthcare payors) agree with MultiPlan on the methodology or calculation that MultiPlan's repricing tool will use to suppress payments to healthcare providers.

        *5.     Government investigations and enforcement actions have also uncovered evidence of MultiPlan's agreements to suppress out-of-network payments to providers.*

269.    Government investigations and enforcement actions have also revealed the existence of MultiPlan's agreements to suppress out-of-network payments to providers. According to an enforcement action by the New York Attorney General against AXA Equitable, in May 2009, AXA had a policy of reimbursing 100% of out-of-network claims. Without prior notice to its

subscribers, in September 2011 AXA switched to using MultiPlan's Data iSight system to reprice out-of-network claims. As a result of that switch, AXA went from paying 100% of out-of-network claims to paying about 50% of those out-of-network claims.

     **E.**    **There indirect evidence of the MultiPlan Cartel's existence.**

         *1.*     ***Insurers engage in actions which, absent concerted action, would be against their individual economic self-interest.***

270.    As part of the MultiPlan Cartel, each Insurer Defendant engages in numerous actions, which (in the absence of concerted action) would be against their individual economic self-interest, but which, in the context of the scheme, maximize profits for the collective. These "actions against self-interest" are strong circumstantial evidence of a horizontal agreement among insurers to reduce competition for out-of-network providers and suppress payment rates.

271.    First, it would be against the economic self-interest of any individual Insurer Defendant to lowball out-of-network providers (the goal and consequence of using MultiPlan, including through agreements to implement aggressive rate caps) because doing so is well known to cause member and provider "abrasion" and, ultimately, economic harm. In the absence of collusion, insurers would pay competitive rates to avoid such economic harm, including subscriber dissatisfaction and loss.

272.    Second, it would be against the economic self-interest of any individual Insurer Defendant to pay for MultiPlan's expensive claims re-pricing services when there are far cheaper, comparable services on the market, including but not limited to those offered by FAIR. Unlike FAIR—which charges insurers a modest, flat annual fee—MultiPlan assesses its clients a fee for each repriced claim, which is based on a percentage of the difference between the billed amount and the sum ultimately paid. For any individual insurer, these contingent fees far exceed the flat annual fee they would have to pay to use FAIR. As such, absent collusion, insurers would not pay

MultiPlan's fees and would use FAIR or another cheaper vendor. They do so only because the insurers and MultiPlan, collectively, do much better by essentially dividing their monopsony profits, than they would in a fair, functioning, and competitive market not mired by collusion.

273.    Third, it would be against the economic self-interest of any individual Insurer Defendant (all of which are sophisticated, well-resourced companies) to use MultiPlan when they could simply develop their own internal algorithms to re-price out-of-network claims and avoid paying fees to a third-party vendor altogether. As MultiPlan has itself admitted, anyone can "create their own algorithms."[41] And, in fact, Defendant United did develop such an algorithm, known as Naviguard. However, United scrapped Naviguard in 2020 after MultiPlan made United a sweetheart deal—in the form of a massive contingent fee discount—to remain within the MultiPlan Cartel. Absent collusion, it would have been economically irrational for United to scrap Naviguard after investing the resources necessary to develop it.

274.    Fourth, it would be against the economic self-interest of each Insurer Defendant to share its competitively sensitive and proprietary pricing data and strategies with other insurers through a common third party, unless they knew all other insurers had agreed to do the same. In the absence of concerted action, insurers would not share such information with rivals (through an intermediary or otherwise) because of the risk of competitive harm. After all, competitors could use the information to make superior bids to out-of-network providers and strengthen their PPO networks and plan offerings relative to the competition.

275.    In addition, the MultiPlan Cartel's conduct is parallel. MultiPlan Cartel members have suppressed the amount paid to healthcare providers for out-of-network claims and, in a continuous and parallel fashion, sent repricing notices and depressed payments to healthcare

---

[41] *See*, *supra*, note 15.

providers pursuant to the MultiPlan Cartel agreement.

276.    MultiPlan also facilitated a transition away from a marketplace in which commercial insurers competed to offer out-of-network providers UCR payments to a coordinated regime in which commercial health insurance networks cut payments to healthcare providers and then split those "savings" with self-funded insurance plans.

277.    The insurance market is made up of two types of plans, risk-based (also called "fully insured") and ASO (also called "self-funded"). Under a risk-based model, the insurance company collects premiums and pays claims. If the premiums exceed the claims, the insurance company profits, but if the claims exceed the premiums, the insurance company carries the risk of loss. Under an ASO model, the employer carries the risk instead— the premiums are paid into the coffers of the employer, and the employer is responsible for paying its employees' claims. The employer pays the insurance company a fixed administrative services fee, per member, per month (a "PMPM" fee) to administer the ASO plan. Under these ASO contracts, the employers take on the risk and associated insurance companies enter into "shared savings agreements" that permit the insurance company to send out-of-network claims for ASO employers to MultiPlan for repricing. Large employers, which make up a substantial or even dominant portion of the market for commercial insurance, are almost all on ASO contracts.

278.    In order to profit from the out-of-network payment suppression under the MultiPlan Cartel, the cartel members added new terms to their ASO contracts. In addition to the PMPM fees, those ASO contracts now require self-insured groups to pay a percentage (usually between 29–35%) on the difference between a billed out-of-network charge and the amount paid on that out-of-network claim, known as the "shared savings fee." Under the most egregious instances of claim payment suppression, that shared savings fee could end up being even higher than the amount paid

to the provider performing the services.

279.    For example, a notification concerning Nokia Corporation's ASO plan notes that Nokia participates in a "shared savings program" administered by United. That notice states: "UnitedHealthcare uses a service called Data iSight to review select out-of-network claims and recommend a reduced payment amount for out-of-network covered services."

280.    These shared savings agreements generate tremendous profits for insurance companies and self-funding employers at the expense of medical providers. United made approximately $1.3 billion from its shared savings agreements to suppress out-of-network claims in 2020. Moreover, in an internal presentation, United stated that it intended to cut its out-of-network payments by $3 billion by 2023.

281.    Therefore, if a subscriber group self-finances its health insurance benefits and enters into an ASO agreement with a commercial health network, the subscriber group, health insurer, and MultiPlan enter into multiple explicit agreements to suppress out-of-network payments to healthcare providers and then split the ill-gotten profits from their conspiracy among MultiPlan, the insurance company, and the subscriber group.

282.    As a result of these agreements, UCR payment, once the industry standard, has gone by the wayside. As John Haben, the former Vice President of Networks at United, testified under oath, United, like the rest of the commercial insurance industry, moved from paying out-of-network claims at "reasonable and customary" rates, or rates determined by benchmarking databases, to using MultiPlan's out-of-network claim suppression tools. One example of such a benchmarking database is FAIR, an independent database that houses aggregated information designed to provide a reasonable and consistent basis for setting payment rates. Before MultiPlan's repricing scheme, FAIR was widely used throughout the industry in pricing out-of-network

payments.

283.    Mr. Haben testified that United did not want to continue using "reasonable and customary" payment rates because those costs were "uncontrolled." As a result, "reasonable and customary" payments for out-of-network claims are a "legacy program" that United rarely, if ever, uses.

284.    Similarly, Debra Nussbaum, an employee of Optum, which is a subsidiary of United, testified at a deposition in the *In re: Out of Network Substance Use Disorder Claims Against UnitedHealthcare*, 19-cv-02075 (C.D. Cal.), case that "when [she] first started with Optum/United Behavioral Health, many plans were utilizing reasonable and customary or UCR. I think that, over time, I've seen a major shift to other out-of-network reimbursement methodologies."

285.    Instead, United, like all of its competitors, has shifted to a "shared savings" model where, instead of paying the prevailing "reasonable" rate for a service, they all use the same tools to reduce payments. And since they all have the same "shared savings" clauses in their ASO contracts, they all profit in the exact same way.

286.    This parallel shift to a new paradigm was orchestrated by MultiPlan, whose sales executives have repeatedly touted the ability of their repricing service to create "savings" by underpaying out-of-network claims. For instance, in 2014, MultiPlan told insurance networks that inpatient and practitioner savings for its Data iSight product were between 55% and 65%. They told multiple networks about the "success" their competitors had experienced in implementing Data iSight and other MultiPlan claims repricing services—thereby encouraging those networks to join their competitors in implementing parallel conduct.

287.    MultiPlan advertises to competing health insurance networks that Data iSight

achieves "optimal reimbursement"—i.e., lower payments to healthcare providers—when "compared to Usual and Customary and Medicare-Based pricing."

288.    As a result of this coordination by MultiPlan, nearly all major insurance companies have implemented "shared savings" strategies, and nearly all of them use MultiPlan's tools to implement those services.

289.    MultiPlan's repricing services also generate parallel repricing offers. According to a complaint filed against MultiPlan in *Emergency Group of Arizona Professional Corp., et al. v. United Healthcare, Inc., et al.*, Case No. CV2019-004510 (Sup. Ct. Ariz., Maricopa Cnty., June 10, 2019), MultiPlan's repricing services result in members of the MultiPlan Cartel offering parallel reimbursement amounts for out-of-network services regardless of the location where the service is offered. For instance, charges that submitted for CPT code 99284 (emergency department visit for the evaluation and management of a patient) on different dates in early 2019, and in different states, nonetheless resulted in MultiPlan presenting the same reimbursement price:

| Location | Date of Service | Billed Amount | CPT Code | Allowed Amount |
|---|---|---|---|---|
| Wyoming | 1/21/19 | $779 | 99284 | $413.39 |
| Arizona | 1/25/19 | $1,212 | 99284 | $413.39 |
| New Hampshire | 1/25/19 | $1,047 | 99284 | $413.39 |
| Oklahoma | 2/8/19 | $990 | 99284 | $413.39 |
| Kansas | 2/10/19 | $778 | 99284 | $413.39 |
| New Mexico | 2/10/19 | $895 | 99284 | $413.39 |
| California | 3/25/19 | $937 | 99284 | $413.39 |
| Pennsylvania | 5/20/19 | $1,094 | 99284 | $413.39 |

This makes no sense absent the existence of a conspiracy. Because the cost of care in Manhattan, New York, is higher than in Manhattan, Kansas, all legitimate methods of reimbursing out-of-network claims account for the geographic difference between where care is administered

290.    In a competitive market, competing health insurance networks would not agree to

use a common tool provided by the same company to suppress out-of-network claims. Among other things, by paying reasonable out-of-network reimbursement rates, health insurance networks could be certain that their insureds would not be refused treatment in contexts where a healthcare provider had the ability to refuse treatment (i.e., outside of the emergency department). Moreover, absent a conspiracy, health insurance networks would make independent decisions on how to reimburse out-of-network claims, with the freedom to consider the specific circumstances underlying each submitted claim, rather than automatically underpaying claims through MultiPlan's across-the-board methodology.

291.    Even if competing health insurance networks' only natural incentive was to keep out-of-network claims effectively contained, they would not naturally agree to do so using the same tools from the same provider. Instead, these competitors should want to compete to find the optimal balance between keeping the costs of claims down while also minimizing the costs of claims disputes that arise when reimbursement offers are too low.

292.    But if the competing health insurance networks agree to implement the exact same reimbursement suppression strategies, they can collectively maximize their profit while shielding themselves from the costs of disputes. The only market players that lose are the providers who have no choice but to accept the suppressed reimbursement offers.

### 2.    *The market for out-of-network providers is susceptible to the formation, maintenance, and efficacy of a cartel.*

293.    As the Ingenix debacle shows, the insurance industry is characterized by numerous features, sometimes called "plus factors," that render the industry susceptible to collusion and bolster the plausibility of the cartel alleged herein.

294.    Multiple "plus factors" support the existence of MultiPlan's collusive agreements to suppress out-of-network reimbursements, including: (1) high market concentration in the

relevant market; (2) high barriers to entry; (3) ample motive to participate in the MultiPlan Cartel; (4) out-of-network providers face high exit barriers when seeking reimbursement for services they provide; (5) the claims submitted by out-of-network providers for reimbursement from insurers are relatively fungible; (6) a history of prior collusion; (7) numerous opportunities to collude, including those directly facilitated by MultiPlan; (8) actions against self-interest that only make sense as part of a common plan; (9) evidence of cartel enforcement mechanisms; (10) pervasive and systematic information exchange between the cartel members and MultiPlan; and (11) customary patterns and courses of dealing that can only be explained by the existence of a cartel agreement. These "plus factors" support the existence of agreements between MultiPlan in a horizontal price-fixing conspiracy.

a.    <u>High Concentration</u>

295.    First, the market among health insurers is highly concentrated. In 2022, the AMA found that 86 percent of PPO markets are highly concentrated as calculated under the Herfindahl-Hirschman Index ("HHI"), a metric used by federal regulators to measure market health with respect to concentration. The AMA, moreover, found that in 58% of metropolitan areas, a single insurer enjoyed a 50% or greater market share, with a significant number of metropolitan areas witnessing a single insurer controlling market shares of 70% or greater. In addition, according to Forbes, in 2021, the top 15 healthcare insurance companies in the nation controlled almost 60% of the entire commercial health plan enrollment in the United States. MultiPlan itself acknowledges this high level of market concentration. In an August 18, 2020 Analyst Day presentation, MultiPlan wrote that "[t]he health insurance sector has consolidated to four top insurers."[42]

---

[42] *See*, *supra*, note 15.

b.      High Barriers to Entry

296.    Second, there are high barriers to entry that make it difficult for new companies to enter the commercial health insurance market with competing plans. These barriers include state and federal regulatory requirements, costs associated with developing physician and patient networks, and developing enough business volume to spread risk. To even gain a foothold, new entrants need to be able to bear the extreme expenditures of time and money required to develop a network of healthcare providers large enough to compete as a commercial healthcare insurer. Even if a new entrant opted not to develop an insurance network, there would still be significant capital outlays required in order to operate as a commercial healthcare payor. They then face the challenge of contending with the economies of scale enjoyed by the large incumbent insurers. Establishing name recognition in an industry occupied by long-entrenched and well-recognized major players presents an additional hurdle.

c.      Ample Motive to Participate in Cartel

297.    Third, MultiPlan and the members of the MultiPlan Cartel have a massive financial motive to suppress reimbursement payments for out-of-network services. MultiPlan is paid a percentage of the underpayment to healthcare providers. In other words, it only makes money if the cartel is successful in suppressing out-of-network reimbursement payments. The more the cartel suppresses, the more MultiPlan gets paid.

298.    Likewise, the Co-Conspirator insurance companies are incentivized to suppress payments to healthcare providers to increase their own profits. For example, in an internal email, United executives stated that by "driving all OON [out-of-network] claims to a more aggressive pricing," United could generate more profits than if it continued paying out-of-network claims at usual and customary rates. The motives of MultiPlan and its Co-Conspirators are aligned because the less the MultiPlan Cartel pays to healthcare providers, the more revenue and profits they get to

keep for themselves and split pursuant to their anticompetitive agreements.

299.    As MultiPlan itself stated in a presentation to investors, its payor-customers' "incentives are completely aligned" with its own. Indeed, in MultiPlan's 2023 10-K, MultiPlan said: "In addition, because in most instances the fee for our services is linked to the savings we identify, our revenue model is aligned with the interests of our customers. . . . Approximately 90% of revenues for the year ended December 31, 2023 were based on a [percentage of savings] achieved rate."

300.    In addition, some insurance companies may have believed (wrongly) that conspiring with their competitors in this way was more appropriate than developing their own out-of-network pricing policies. For example, in 2015, a Cigna employee sent an internal email regarding out of network outpatient behavioral health charges. In the email, the employee expressed concern with developing "medicare equivalent" charges internally, referencing the problems with Ingenix (detailed further below). In the email, the Cigna employee stated: "We cannot develop these charges internally (think of when Ingenix was sued for creating out of network reimbursements)[.] We need someone (external to Cigna) to develop acceptable Medicaid or otherwise acceptable charges . . . ."

### d.    High Exit Barriers

301.    Fourth, out-of-network providers face high exit barriers when seeking reimbursement for services they provide. As noted previously, in the United States, some 90% of all healthcare costs are reimbursed, not by patients, but by third-party payers. Given this reality—along with laws and regulations limiting the ability of providers to directly bill patients—out-of-network providers generally have no substitutes for where to seek reimbursement but from a patient's insurer. The only way for out-of-network providers to "exit" this third-party payer system is to refuse to treat patients unless they pay cash, something very few patients can afford.

e.    Fungibility

302.    Fifth, the claims submitted by out-of-network providers for reimbursement from insurers are relatively fungible. All claims are submitted using uniform billing codes, no matter the insurer or the provider. This allows MultiPlan to reprice claims consistently for like claims submitted by providers to different insurers and across different health plans, across the entire country, making it feasible for MultiPlan and the Insurer Defendants to execute their anticompetitive scheme.

f.    History of Prior Collusion

303.    Sixth, MultiPlan Cartel members have a history of prior collusion. It is easier for firms in a market to conspire with one another if they have done so before. Because commercial health insurance networks cannot collectively control out-of- network reimbursement rates through legally enforceable contracts (which is the way that they have traditionally controlled in-network reimbursement rates), they have attempted to enter into illegal cartel agreements to suppress out-of-network reimbursements on multiple occasions. As noted above, in 2008, the New York Attorney General began investigating United's subsidiary, Ingenix. The New York Attorney General's investigation showed that competing commercial health insurers were sending detailed information on their out-of-network claims to Ingenix to be included in a database that was used to calculate out-of-network reimbursement rates for commercial health insurers. The Attorney General's investigation showed that Ingenix's database resulted in out-of-network claims being underpaid by 10%–28%. On January 13, 2009, United entered into a settlement with the New York Attorney General under which United agreed to shut down the Ingenix database and contribute $50 million toward the creation of a new, independent database—the FAIR database—that would house more aggregated information. As part of a related civil settlement, United and other MultiPlan Cartel members agreed to use the FAIR database for a period of time. After that time

period expired, United and other insurers agreed to join the MultiPlan Cartel. As a result of this prior collusion, the Co-Conspirators knew one another and knew that they could trust each other to collude and not alert the government to the existence of the MultiPlan Cartel.

g.    Opportunities to Collude

304.    Seventh, members of the MultiPlan Cartel have had ample opportunities to meet and collude, including at events organized and hosted by MultiPlan itself. For instance, MultiPlan maintains a Client Advisory Board ("CAB") that hosts lavish, multi-day retreats that bring together executives from competing health insurers (including the Insurance Defendants) to discuss topics such as MultiPlan's ability to deliver cost savings through its programs. These retreats occurred in 2015, as well as in 2019 and 2021, and possibly at other times. In 2019, MultiPlan hosted a CAB retreat at a luxury spa in Laguna Beach, California attended by executives from MultiPlan, United, Aetna, Cigna, Humana, several Blue Cross Blue Shield associations, and other insurance companies. It held a similar event in the same city in 2021.

305.    At these meetings, MultiPlan has seated insurer invitees next to each other, which gives them an opportunity to discuss and join the MultiPlan Cartel. According to sworn testimony by a United executive, at these events, insurance executives "[t]ypically . . . talk about things they've implemented" using MultiPlan's Data iSight scheme and "other things they're looking at" to reduce out-of-network costs, and share with each other "new information" about their efforts in this regard. MultiPlan also makes its own presentations concerning cartel members' cost reduction efforts, facilitating the exchange of sensitive, proprietary payment information between rivals.

306.    The Insurer Defendants and MultiPlan have had opportunities to collude through other channels as well. Aetna, Centene, Cigna, CVS Health, Elevance, HCSC, Humana, and other insurers are members of AHIP (formerly, "America's Health Insurance Plans"), a trade organization of insurers that regularly holds conferences and meetings (both public and private).

MultiPlan sponsors and sends representatives to AHIP events. Numerous executives employed by the Insurer Defendants and their co-conspirators sit on AHIP's Board of Directors, including: Gail K. Bourdreaux, President and CEO of Elevance; Bruce D. Broussard, President and CEO of Humana; David Cordani, Chairman and CEO of Cigna; Sarah London, CEO of Centene; Karen S. Lynch, President and CEO of CVS Health (the parent company of Aetna); and Maurice Smith, President, CEO, and Vice Chair of HCSC.

307.    AHIP hosts conferences, committee meetings, and board meetings multiple times a year where its members participate in private, closed-door meetings. In 2023, MultiPlan sponsored AHIP's Annual Conference. Upon information and belief, MultiPlan representatives attended AHIP's 2023 Annual Conference from June 13–15 in Portland, Oregon.

308.    MultiPlan also engages in "road shows," visiting various insurance companies, including the Insurer Defendants, to provide updates regarding its claims repricing services. At these road shows, MultiPlan executives (including Dale White and Susan Mohler) have shared with insurers detailed descriptions of Data iSight's repricing methodology, the "savings" achieved by various MultiPlan customers, and recommendations to further reduce out-of-network reimbursements. Upon information and belief, MultiPlan meets with each of its clients each year at such road shows, which allows the MultiPlan Cartel to be regularly updated and renewed.

### h.    Actions Against Self-Interest

309.    Eigth, insurers that joined the MultiPlan Cartel have engaged in actions against self-interest. The very agreements between MultiPlan and the commercial health insurance networks are economically irrational absent coordination. If a single insurance network entered into an agreement with MultiPlan to shift away from the UCR methodology and drastically underpay out-of-network claims, healthcare providers would simply refuse to treat insureds of that network altogether (absent a scenario requiring treatment, such as emergency services). As a result, the

health insurance network would face serious harm to the value and breadth of its insurance offering as healthcare providers refuse treatment, ultimately leading to a loss of customers for the insurance network.

310.    Such an agreement, standing alone, would also expose a health insurance network to significant time and cost expenditures associated with repricing negotiations. While healthcare providers cannot effectively negotiate with the MultiPlan Cartel due to the volume of MultiPlan repricing offers, a single insurance network acting alone would face significant pushback from providers.

311.    The insurance network acting alone would also be less likely to secure deals to bring healthcare providers in-network, further reducing the value and potential earnings of the insurance network. These obvious impacts would reduce profits significantly more than any savings generated by the out-of-network underpayment agreement with MultiPlan. The only way the agreement with MultiPlan is not economically self-defeating is if all insurance networks agree to join the MultiPlan Cartel.

312.    MultiPlan has explicitly told investors that its tools are "a much better mechanism" for repricing claims "versus [payors] doing it themselves." As MultiPlan's President of New Markets, Paul Galant, put it: "[I]f a payer decides to do everything on their own, their ability to go back to providers and push for savings is fundamentally different than ours." MultiPlan acknowledges that, without industry coordination, an independent payor cannot single-handedly slash reimbursements to providers. But, through MultiPlan, which "can talk to the entire industry," all payors can agree to join the MultiPlan Cartel and eliminate the risk of individual conduct.

313.    In addition, the insurers that have joined the MultiPlan Cartel have refrained from engaging in self-interested, unilateral conduct that would have destabilized the cartel.

314.    For example, MultiPlan's competitor-clients have abandoned efforts to in-source claims repricing activities despite the vast savings that such efforts would generate and—in at least one case—despite spending considerable sums actually developing an alternative claims repricing product. As the nation's single largest commercial health insurance provider, United could easily analyze its own historical claims database to ascertain the most efficient pricing levels for out-of-network reimbursements. It could then reprice claims received from healthcare providers based upon that data. This would allow United to eliminate MultiPlan as a middle man, saving as much as 9.75% on each repriced out-of-network claim, an amount equal to hundreds of millions of dollars per year. In 2021, United created a product to do just that. It was known internally as Naviguard. One analyst described Naviguard as "an in-house replacement for MultiPlan."

315.    United developed a "roadmap" to terminate its contract with MultiPlan by 2023 in anticipation of Naviguard coming online. That plan was ultimately scrapped. United renewed its contract with MultiPlan in January 2023 instead.

316.    United's decision makes no economic sense absent a conspiracy. United, like all commercial payors, has a unilateral economic incentive to compete against other health insurance networks to ensure that its insureds can see any healthcare provider out-of-network and must therefore pay competitive reimbursement rates. United developed Naviguard to assess and pay claims unilaterally, consistent with that economic incentive. Instead of following through with bringing Naviguard online, United abandoned the project and effectively recommitted itself to the MultiPlan Cartel by renewing its contract with MultiPlan to use MultiPlan's out-of-network claims suppression technology.

317.    United's expenditures on Naviguard and its subsequent decision not to bring claims repricing in-house and instead renew its contract with MultiPlan are actions against self-interest,

which only make sense in the context of a horizontal conspiracy wherein MultiPlan is fixing prices amongst payors for out-of-network reimbursements.

318.    Joining the MultiPlan Cartel makes very little sense for large payors, like United and Cigna, that can afford to create their own in-house claim suppression tools. It costs millions of dollars to build out the data links and associated information technology necessary to transmit securely a high volume of real-time claims information to MultiPlan for adjudication and repricing in less than 24 hours. It makes zero economic sense for a payor to spend millions of dollars building a data link so that it can share raw information on submitted claims and repricing adjudications with its competitor. The only rational explanation for taking on that sunk cost is that those payors believe that they can recoup those costs through the windfall profits generated by the MultiPlan Cartel.

i.    Evidence of Cartel Enforcement Mechanisms

319.    Ninth, because a cartel agreement is against public policy, members of the cartel cannot go to court to enforce their illicit agreement. As a result, they need to create informal structures of detecting attempts to disrupt the cartel agreement and ways of enforcing the cartel agreement by heading-off those attempted disruptions.

320.    United's plan to abandon the MultiPlan Cartel and to use its in-house Naviguard system to reprice out-of-network claims was one such attempted disruption to the cartel agreement. Having the largest healthcare payor in the United States defect from the MultiPlan Cartel would inevitably destabilize the agreement and might cause other payors to reevaluate their participation in the cartel.

321.    So, MultiPlan bought off United with a sweetheart deal. Upon information and belief, in 2022, MultiPlan and United negotiated a new contract for repricing services that went into effect in 2023. MultiPlan gave United extremely favorable commercial terms, allowing United

to capture nearly all of the underpayments generated by MultiPlan's claims suppression methodology.

322.    This sweetheart deal was so good for United that it caused a temporary drop in MultiPlan's financial performance, which MultiPlan executives discussed during quarterly earnings calls with investors in the fourth quarter of 2022 and the first quarter of 2023. In MultiPlan's 2022 fourth quarter earnings call, MultiPlan's then-CEO Dale White explained, "we have been anticipating that a multiyear contract renewal with one of our largest customers would mute our 2023 revenue growth" and that the contract renewal would be "a headwind against growth in 2023."

323.    As a result of MultiPlan's efforts to keep its largest customers using its repricing tools and in the cartel, in the first quarter of 2023, MultiPlan experienced a 20.6% drop in revenues versus the first quarter of 2022 and a 30.7% drop in earnings before interest, taxes, depreciation, and amortization versus the first quarter of 2022.

324.    However, MultiPlan was willing to sacrifice short-term revenues and profits in order to stabilize the cartel and keep the largest cartel members in the fold. As MultiPlan's then-CEO Dale White explained during MultiPlan's earning call for the first quarter of 2023, renewing repricing agreements with the largest healthcare payors in the United States made MultiPlan's leadership "increasingly confident that our revenues are stabilizing and poised for growth over the next several years."

325.    In an apparent effort to sweeten the deal and keep United in the cartel, on June 27, 2023, MultiPlan announced that John Prince, the former President and Chief Operating Officer of Optum, United's health services subsidiary, would join MultiPlan's board of directors.

326.    MultiPlan's efforts to enforce the cartel agreement by buying the loyalty of one of

the largest payors in the cartel appears to have worked. In an August 2, 2023 press release, the CEO of MultiPlan hailed the second quarter of 2023 as an "inflection point" in which MultiPlan "deliver[ed] second quarter results at the high end of our expectations," leading MultiPlan to increase its revenue guidance for investors for 2023.

327.    MultiPlan's willingness to sacrifice short-term profits does not make economic sense absent its knowledge that perpetuating its conspiracy to underpay healthcare providers would pay off in the long run.

328.    The MultiPlan Cartel also has structures for monitoring and enforcing the cartel. Typically, a cartel agreement is more stable if the participants in the cartel have a reliable means of ensuring that each of the members of the cartel is abiding by the collusively set price by monitoring and enforcing their pricing agreement. One of the most efficient ways for members of a cartel to reach an agreement on collusive pricing and to ensure that pricing sticks is for every member of the cartel to allow one competitor to set prices and negotiate those prices. That is exactly what has happened here. Each of the competing payors, who should have been exercising their own discretion to set prices for out-of-network claims, entered into agreements that gave MultiPlan the right to set prices for each cartel member's out-of-network claims and then made MultiPlan the sole entity responsible for negotiating payment of those collusively set prices.

329.    MultiPlan and its Co-Conspirators were brazen enough to write formal contracts that included dispute resolution provisions. For example, MultiPlan's contract with Aetna contains a clause enforcing their out-of-network pricing agreement through "mediation . . . administered by the American Arbitration Association under its Mediation Rules for Commercial Financial Disputes . . . in the city of New York." The contract contemplates the possibility that if that mediation was unsuccessful, MultiPlan could sue Aetna to, among other things, enforce the terms

of their out-of-network pricing agreement. This threat of litigation or mediation served as a check that ensured the compliance of MultiPlan's Co-Conspirators.

330.    MultiPlan's percent of savings payment model also enables MultiPlan's Co-Conspirators to ensure that MultiPlan is underpaying out-of-network claims. MultiPlan sends regular reports to competing payors about how little a healthcare provider is paid for out-of-network claims as a result of MultiPlan's proprietary pricing methodology. From these reports, MultiPlan's competitors can monitor how well MultiPlan is adhering to its agreement to cause healthcare providers to be underpaid for out-of-network claims.

331.    In addition, MultiPlan recently increased its ability to exchange real-time pricing data and benchmarking information. In June 2023, it announced a new product in its Data and Decision Science solution suite: PlanOptix.

332.    MultiPlan said it created PlanOptix as a direct response to its payors' demands. The product enables "access" to 400 billion "fully indexed" records. For example, a payor can "search a CPT code and understand the price of that particular service . . . at a provider under a certain network." However, payors told MultiPlan that "[i]t's not enough to simply get to the data and information because the records are vast." They wanted payor pricing information.

333.    When MultiPlan first announced PlanOptix, it had already "ingested data on over 70 payors," including "all of the national major carriers as well as many of the regional ones."

334.    Per payors' requests, MultiPlan enhanced PlanOptix to show competitor pricing data—"not just at a global level, but even at a service level right, labs and X-rays versus inpatient, inpatient versus outpatient." MultiPlan explained that, using PlanOptix, payors would be able to answer questions such as: "Where do I sit versus my competitor?" and "How do I ensure that I'm negotiating correctly when I measure myself against my competitors?"

335.    In other words, PlanOptix enables the members of the MultiPlan Cartel to monitor one another's adherence to their agreement to suppress out-of-network reimbursements by eliminating price competition on out-of-network claims. It does so by allowing health insurance payors to directly compare how much they pay to a particular provider for a particular type of out-of-network service.

336.    At the November 28, 2023 Bank of America Leveraged Finance Conference, Mr. White openly stated that the purpose of PlanOptix is to "enable payers to benchmark themselves against their competitors." He explained that, using PlanOptix, a payor will know "whether they're above or below or on par with their competition," including with regard to reimbursements paid to "a specific provider."

337.    Finally, MultiPlan also prepares white papers for its claims repricing clients, which include references to the claims repricing strategies adopted by other insurers and instruct them on how to implement the scheme.

j.    Pervasive and Systematic Information Exchange

338.    Tenth, competitors like the members of the MultiPlan Cartel are unlikely to exchange large volumes of competitively sensitive pricing information in the absence of a cartel agreement.

339.    However, MultiPlan and competing commercial health insurance companies have agreed to exchange data regarding claims submitted by healthcare providers, reimbursement offers made by commercial health insurance companies in response to those submitted claims, and the actual amount paid in response to those claims.

340.    The data exchanged is voluminous. In December 2021, MultiPlan had access to "over 3 petabytes of structured claims data from across 700 payer customers." By June 2023, MultiPlan touted that it had "10+ petabytes of [claims] data."

341.    Indeed, during a deposition in an ERISA litigation, when asked whether there was "any information that MultiPlan would not provide for Cigna if Cigna asked," the Cigna witness responded: "from my experience, if I asked for information, they would provide it to me."

342.    A United witness in other related litigation said the same. When asked "do you think there's any question that you could ask about the data supporting Viant OPR that . . . MultiPlan would not answer?" he responded, "I have no reason for MultiPlan not to share or provide answers to any questions that we have asked." In response to the follow up question "so you think that they would answer any question you ask; right?", he responded, "any question specific to the program, yes."

343.    The information exchanged by MultiPlan and the other members of the MultiPlan Cartel is exactly the type of information exchange that the courts have recognized is likely to have anticompetitive effects. *See*, *e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 441, n.16 (1978) ("Exchanges of current price information, of course, have the greatest potential for generating anti-competitive effects."); *Todd v. Exxon Corp.*, 275 F.3d 191, 212 (2d Cir. 2001) (Sotomayor, J.) ("Price exchanges that identify particular parties, transactions, and prices are seen as potentially anticompetitive."). First, the data exchanged is real-time pricing data, transmitted to MultiPlan automatically and expeditiously through electronic data links from its health insurance clients. Second, the data exchanged is specific to commercial insurance claims. Third, the data exchanged is not publicly available—although hospitals do publish some pricing information online, it is not updated in real-time. Fourth, the data is granular and unblinded—meaning that MultiPlan knows exactly what its competitors are charging for specific medical services and procedures.

344.    Here, MultiPlan uses this data to explicitly share confidential pricing information among members of the MultiPlan Cartel in order to fix prices. As discussed previously, when

seeking to establish United's out-of-network reimbursement rates, MultiPlan told United that prices set at 350% of Medicare rates would "be in line with another competitor" and "leading the pack along with another competitor."

345.    MultiPlan also disclosed the specific 'option' used by Blue Cross Blue Shield ("option 3") to United executives when recruiting United into the MultiPlan Cartel. United executive John Haben included this information in a September 8, 2016 email to Lauren Paidosh (another United employee) and later conceded under oath that he received it from MultiPlan.

346.    The Co-Conspirators enter the MultiPlan Cartel knowing that MultiPlan will share their commercially sensitive pricing information with other existing and prospective members of the MultiPlan Cartel.

347.    While MultiPlan shares reams of information about its proprietary pricing methodology with competing payors, it keeps the same details hidden from providers. When a provider reached out to MultiPlan to learn more about its pricing methodology in July 2019, MultiPlan's executives decided to withhold key information from the provider. In an email sent on July 10, 2019 at 7:50 a.m., Bruce Singleton, MultiPlan's Senior Vice President for Network Development Strategy, told Mike McEttrick, MultiPlan's Vice President of Healthcare Economics, that he wanted to keep the discussion with that provider at "eye level," meaning that he did not want to share the details of how MultiPlan's pricing methodology actually worked with the provider.

348.    Competing companies would not risk sharing individual, real-time, and competitively sensitive pricing information with their rivals. Nor would competing companies pay millions of dollars to MultiPlan while simultaneously sharing their competitively sensitive information with MultiPlan absent an agreement to restrain competition. The information

exchange operated by MultiPlan and the other members of the MultiPlan Cartel is more consistent with an agreement to restrain trade than competition on the merits. Therefore, this type of information exchange is circumstantial evidence of a cartel agreement among competitors.

k.    Customary Patterns

349.    Eleventh, MultiPlan has a long history of facilitating and stabilizing the MultiPlan Cartel.

350.    MultiPlan boasts that it is "deeply embedded into [its Co-Conspirators'] claims platforms."

351.    MultiPlan emphasizes the long-term nature of its relationships with its analytics and claims repricing clients. In a June 28, 2023 investor presentation, it stated that its "Average Length of Large Customer Relationships" was over 25 years.

352.    In the words of Churchill Capital's CEO, Michael Klein, MultiPlan has achieved "payer lock" due to MultiPlan's deep and long-standing integration into its clients' claims processing operations.

353.    In MultiPlan's Q3 2020 earnings call on November 12, 2020, then-CEO Mark Tabak described MultiPlan as having "created a competitive moat around our company that drives high recurring revenues."

354.    For over a decade, commercial health insurance providers with collective dominance in the U.S. Commercial Reimbursement Market have been locked into multi-year contracts to use MultiPlan's claims repricing services. MultiPlan's consistent public statements trumpeting this high level of market participation and promoting acceptance rates of its reimbursement offers in the high 90th percentile provide reassurances regarding the stability of the cartel to its members.

355.    The MultiPlan Cartel has a long-standing and well-functioning ringleader in

103

MultiPlan. MultiPlan takes the lead in recruiting new members into the cartel, shares information with them about the advantages of collusive pricing, threatens that they will suffer financial disadvantage by not joining or defecting from the cartel, and enforces price discipline by encouraging cartel members to match the "aggressive" repricing settings of their competitors.

356.    These customary patterns, formulas, and leadership are circumstantial evidence of agreements and a conspiracy to suppress reimbursement rates.

## VII.    Relevant Market and Monopsony Power

### A.    The relevant market is the U.S. commercial reimbursement market.

357.    If a relevant antitrust market needs to be defined, the relevant market is the market for the reimbursement of out-of-network provider services by third-party payers.

358.    In this market, healthcare providers like Plaintiff are sellers of out-of-network medical care, while third-party payers like the Insurer Defendants are buyers of those services.

359.    Healthcare providers in this market have no reasonable substitutes for the reimbursements provided by commercial insurers for out-of-network medical services, as balance billing patients is futile or illegal in many instances. Moreover, MultiPlan, which along with its Co-Conspirators collectively dominates the relevant market, forces healthcare providers to forgo any reimbursement from insureds as a condition of receiving any compensation at all for out-of-network claims.

360.    While healthcare providers can receive reimbursement payments from governmental sources, such as Medicare, Medicaid, and Tricare, those sources of payment are not viable alternatives for commercial reimbursements and do not compete against commercial health insurance. As federal courts have held, "the reality [is] that 'the substitution between commercial buyers and other payors is low, as reflected in measures such as low cross elasticity of demand.'" *In re Blue Cross Blue Shield Antitrust Litigation*, 2017 WL 2797267 at *5–6, 9 (N.D. Ala. June

28, 2017). These forms of government-paid insurance address populations that are not typically served by commercial health insurance. For example, Medicare and Medicaid have statutory age, income, or disability requirements. Similarly, Tricare is available only to current and former members of the United States military.

361.    The commercial reimbursement market is distinct from the market for reimbursements from non-commercial payors for additional reasons. First, healthcare providers have no ability to negotiate the fees that government insurers pay them. Medicare, Medicaid, and other government programs unilaterally set their reimbursement rates. By contrast, providers negotiate the rates that commercial insurance companies pay, and ordinarily charge commercially insured patients more than they charge Medicare or Medicaid patients. Second, government-paid insurance also does not reimburse in a similar manner as commercial insurance. Medicare reimbursements are unprofitable.

362.    Providers, including Plaintiff, instead look to commercial insurance reimbursements to recoup their costs of rendering healthcare services. Indeed, commercially insured patient cases are essential to the financial sustainability of healthcare providers.

363.    Plaintiff, like most healthcare providers, relies upon commercially insured patient cases for their financial sustainability.

364.    MultiPlan itself recognizes that government payors and commercial payors operate in different markets. On the home page of its website, MultiPlan features a drop down entitled Markets under which it lists Commercial and Government as separate "markets" it serves:



365.    In addition, MultiPlan's filings with the SEC make clear that it views government programs as occupying a distinct market segment from the commercial market. In the "Markets We Serve" section of its 2023 10-K, MultiPlan said of Government Programs: "This market segment includes Medicare, Medicaid, TRICARE, Federal Employees Health Benefits, Veterans Administration and other federal health programs (state and municipal government health plans typically are managed as commercial plans). Commercial insurers and health plans also participate in this market segment, but there also are Payors that operate government plans exclusively. Most, but not all, of MultiPlan's commercial healthcare services also are of value to Payors of government programs."

366.    Furthermore, MultiPlan views in-network and out-of-network claims as occupying separate markets. Indeed, MultiPlan's key product, in its own words, is an out-of-network repricing product. For example, in discussing MultiPlan's recent acquisition of Benefits Science LLC ("Benefit Science Technology" or "BST") during a recent presentation at the 42nd Annual J.P. Morgan Healthcare Conference, then-CEO Dale White explained "MultiPlan's focus over the past 40 years has been on out-of-network claims . . . the products and services that BST has in terms of

data, data analytics, advanced healthcare analytics, all enable us, it's the gateway to the in-network claims, it's the gateway into Medicare Advantage, it's the gateway into Medicaid." Implicit in MultiPlan's explanation of its acquisition of BST is that MultiPlan's primary products had prior to the acquisition were not yet used in the government or in-network space because they are different markets entirely.

367.    A common method to determine the scope of a relevant antitrust market is to assess whether a hypothetical monopolist could impose a small but significant non-transitory increase in price ("SSNIP") in the proposed market, typically 5%. In a case challenging a buyers' cartel, such as this one, the relevant test is whether a hypothetical monopolist could impose a small but significant reduction in purchase price ("SSRIPP"). In this case, a hypothetical monopolist could impose a SSRIPP of 5% or more in out-of-network reimbursements without causing healthcare providers to switch to other forms of reimbursement because hospitals are required by federal and state laws to perform many out-of-network services, and once those services are performed hospitals are locked into negotiating with a single payor. The same is true of the payor-specific submarkets—a payor can impose an SSRIPP on out-of-network services because the negotiation of prices for those services occurs after the service is provided and the hospital is locked into negotiating with a single payor.

368.    Moreover, MultiPlan's imposition of an industry-wide pricing scheme for out-of-network services provides a natural experiment to test the bounds of the relevant market. Despite MultiPlan and its co-conspirators decreasing reimbursement rates for out-of-network services substantially from the prior FAIR and UCR amounts that existed in the pre-conspiracy period, healthcare providers continued to provide out-of-network services. This suggests that a SSRIPP would not result in a sufficient number of healthcare providers switching to other forms of

reimbursement, such as services for government-payors or in-network services.

369.    The relevant geographic market is the United States. Medical providers in the United States cannot practicably turn to payors in other countries, where private medical insurance is uncommon or non-existent and nearly all medical care is administered as a part of a comprehensive government program, for reimbursement of out-of-network medical services. The U.S. healthcare industry, including the market for reimbursement of out-of-network services, is universally recognized by industry participants as distinct from healthcare industries in foreign countries, and is subject to a variety of unique federal and state laws and regulations that apply only in the United States. The relevant geographic market is not smaller than the United States because healthcare providers can practicably turn to commercial insurers located in other parts of the country for reimbursement of out-of-network services.

### B.    The MultiPlan Cartel has market power in the relevant market.

370.    MultiPlan and its Co-Conspirators, through their conspiratorial agreements, collectively hold dominant power in the relevant market. Nearly every commercial insurer that participates in the relevant market has agreed with MultiPlan to suppress out-of-network reimbursement payments. The members of the MultiPlan Cartel, including MultiPlan, United, Cigna, Humana, Elevance, Aetna, Guidewell, and others, collectively control at least 90% of the relevant market.

371.    As MultiPlan has repeatedly stated, each of the "top 15" health insurance companies and over 700 payors subscribe to its claims repricing service. According to Forbes, in 2021, those top 15 healthcare insurance companies alone controlled almost 60% of the entire commercial health plan enrollment in the United States.

372.    MultiPlan claims that the entire nation-wide market for out-of-network commercial reimbursements is approximately $130 billion annually. Out of that $130 billion, MultiPlan claims

that it processed $106 billion in charges in 2019.

373.    By claiming to process $106 billion in out-of-network commercial reimbursement charges out of a potential $130 billion, MultiPlan acknowledges that it processes approximately 81.5% of the out-of-network commercial reimbursement claims submitted in the United States.[43]

374.    MultiPlan's market power has continued to grow since 2019 as its largest clients have gained market share and additional claims repricing clients have signed up.

375.    MultiPlan stands nearly alone in the out-of-network claims repricing business. MultiPlan claims that Data iSight differentiates itself through its patented repricing methodology and its large, proprietary database of historical claims, whereas others claims repricing services base their methodologies on usual and customary rates or Medicare rates. In an Analyst Day presentation, MultiPlan touted that it can process a claim and deliver it back to the payor "within 5 seconds."

376.    MultiPlan faces only limited competition, most notably from a company called Zelis. But Zelis and other claims repricing services are mere bit players compared to MultiPlan. In 2022, Zelis processed approximately 2 million claims for repricing. According to a June 28, 2023 presentation, in 2022, MultiPlan processed 546 million claims, accounting for $155 billion in claims. Indeed, MultiPlan touted to investors in 2020 that it is "the largest player in the commercial out-of-network space."

377.    The market for reimbursements paid by commercial insurers to healthcare providers for out-of-network medical services is protected by high barriers to entry. Commercial health insurance in the United States has long been a highly concentrated industry, with a small number of large insurers dominating the market. And as noted above, the top 15 insurance

---

[43] *See*, *supra*, note 15.

companies (which control almost 60% of the entire commercial health plan enrollment in the United States) and hundreds more insurance companies have all agreed with MultiPlan to use its claims repricing services.

378.    Indeed, during a trial, Rebecca Paradise, the Vice President of Out-of-Network Strategy at United, testified that MultiPlan said the Data iSight tool was "widely used by our competitors." Moreover, most of MultiPlan's contracts with customers are three years or longer in length, with "high renewal rates." MultiPlan has even touted the "stickiness" of its "long- term customer relationships."

379.    This high collective market concentration of the members of the MultiPlan Cartel is probative circumstantial evidence of agreement or agreements to conspire. This dominant collective market power has allowed the MultiPlan Cartel to impose anticompetitive effects on the entire relevant market.

380.    In addition to this collectively dominant market power, each insurance company has complete buyer-side market power in the submarket for reimbursements of out-of-network healthcare services provided to its own insureds.

381.    When healthcare providers provide out-of-network services to a patient, their only option for seeking reimbursement for those services is to submit a claim to the particular health insurance company that administers the insurance plan in which that patient is enrolled. Thus, when providers provide out-of-network services to a patient insured by Cigna, for example, they have no choice but to seek reimbursement from Cigna, and no other insurance company or payor is a viable source of reimbursement.

382.    As a result, each health insurance company has complete buyer-side power over the reimbursement of out-of-network services provided to its own insureds. When a health insurance

company agrees with MultiPlan on the methodology for suppressing reimbursements for such services, it is entering into a price-fixing agreement backed by complete market power in the relevant submarket, leaving healthcare providers like Plaintiff with no practicable option but to accept the artificially suppressed reimbursement that MultiPlan's methodology generates.

### C.    The MultiPlan Cartel harms competition throughout the relevant market and has no procompetitive effects.

383.    Because the MultiPlan Cartel's agreement suppresses reimbursements paid to healthcare providers, MultiPlan and the MultiPlan Cartel made lower reimbursement payments to healthcare providers than the cartel members would have made but for the existence of the cartel agreement. Were it not for the conspiracy, members of the MultiPlan Cartel would have competed against one another to provide adequate compensation to healthcare providers for out-of-network care so that they could guarantee their insureds access to a wide variety of healthcare professionals within or outside of their networks.

384.    Commercial insurers want to maintain access to a broad range of out-of-network healthcare providers so they can market the reach of their insurance products. As federal regulators have recognized, "commercial health insurers compete to sign up . . . healthcare providers for their networks," and a key aspect of this competition is offering "more generous reimbursement terms" to out-of-network healthcare providers so such providers will accept patients from their commercial health insurance network. *U.S. v. Anthem* (1:16-cv-01493), ECF 1, ¶ 64 (D.D.C. filed July 21, 2016).

385.    MultiPlan itself recognizes this dynamic. In describing the Payment & Revenue Integrity Services on its website, MultiPlan claims it is "uniquely qualified to help [payors] reduce waste and abuse." MultiPlan explains "[u]nlike other companies that offer healthcare Payment Integrity solutions, MultiPlan operates networks with more than 1.4 million participating

providers. We use our Payment Integrity services on our network claims. We value amicable relationships with providers and work to preserve the relationship between payors and providers."[44]

386.    Indeed, in MultiPlan's 2023 10-K, MultiPlan went further to explain the importance of its relationships with providers, saying: "We depend on our providers and our PPO networks to maintain the profitability of our network-based and analytics-based services, as well as the future expansion of our operations. The healthcare providers that constitute our network are integral to our operations. Specifically, a portion of the revenues from our analytics-based services are based on a percentage of the price concessions from these providers that apply to claims of our Payor customers. Further, our ability to contract at competitive rates with our PPO providers will affect the attractiveness and profitability of our network products."

387.    Some commercial insurance networks, such as MultiPlan's PHCS Network, are marketed directly to employment groups, individuals, or other payors, while other commercial insurance networks, such as MultiPlan's "wrap" PPO network, are marketed to other commercial insurers. In either case, the number and range of healthcare providers willing to accept patients on an out-of-network basis is a key selling point, and therefore the necessity of competition between commercial insurers to compensate healthcare providers for out-of-network services is unchanged.

388.    Healthcare providers cannot avoid the anticompetitive effects of the MultiPlan Cartel. Providers have no practical ability to reject MultiPlan's take-it-or-leave-it terms and attempt to negotiate a better reimbursement rate. As one healthcare provider explained, "When we reject a [MultiPlan proposal], it takes months to get any payment and we never get paid more than the amount of the [original MultiPlan proposal]."

---

[44] *See* https://perma.cc/REM9-NUFT.

389.    The New York Times's reporting confirmed the providers' inability to negotiate with MultiPlan. It wrote that "Documents and interviews revealed tactics meant to pressure medical practices to accept low payments. Some offers came with all-caps admonitions and deadlines just hours away. Accept and receive prompt payment; refuse and risk an even lower payout. Practices and billing specialists said this often wasn't an empty threat."

390.    MultiPlan also threatens to drop their reimbursements if healthcare providers do not accept their cut-rate offers. In a fax to a healthcare provider, MultiPlan gave the provider eight days to respond to a low-ball offer. But the fax warned, "Please note that if you do not wish to sign the attached proposal . . . this claim is subject to a payment as low as 110% of Medicare rates based on the guidelines and limits on the plan for this patient." In other words, if the provider disagrees with MultiPlan's offer, MultiPlan will lower the reimbursement rate even further.

391.    The New York Times reported on April 7, 2024 that: "In some instances, the fees paid to an insurance company and MultiPlan for processing a claim far exceeded the amount paid to providers who treated the patient. Court records show, for example, that Cigna took in nearly $4.47 million from employers for processing claims from eight addiction treatment centers in California, while the centers received $2.56 million. MultiPlan pocketed $1.22 million."

392.    While the state and federal laws discussed above establish procedures for providers to dispute reimbursement amounts through arbitration, the sheer volume of claims that are underpaid by the MultiPlan Cartel make arbitrating each individual claim practically and financially impossible.

393.    MultiPlan also "erect[s] a bureaucratic layer so thick and complicated that few can

navigate it."[45] MultiPlan relies on the fact that medical billers overseeing a massive flow of out-of- network claims will not have the time to fight back on individual claims. MultiPlan disputes and reprices nearly every out-of-network claim, giving medical billers less than 10 days to respond to those offers. When a medical biller asks the insurer how MultiPlan reprices its claims, the insurance company explains that it is not responsible for MultiPlan's pricing. When the medical biller tries to negotiate with MultiPlan, MultiPlan tells the biller that it is not the insurer and does not have authorization to negotiate with the healthcare provider.

394. According to a 2018 MultiPlan study, 99.4% of all out-of-network claims for inpatient treatment that are repriced by Data iSight are accepted by healthcare providers. MultiPlan claims that as little as 2% of Data iSight's repricing recommendations are appealed for all claim types. MultiPlan has a dominant position as the sole source for out-of-network claim suppression because it has developed a pricing methodology that is often the first, second, and third in a "stack" of pricing methodologies that payors use to slash out-of-network claims. For example, a payor will use MultiPlan's Data iSight product as a "first pass" out-of-network "repricing" method, but it will use MultiPlan's Viant, MARS, or Pricer Pro products as second- or third-pass "repricing" methods. So, if a provider rejects a low-ball offer generated by Data iSight, its next offer will be materially worse because it will be generated by an even more aggressive pricing logic used by another MultiPlan product. In this way, MultiPlan enables its competitors to suppress out-of-network payments by threatening that subsequent offers will be worse for the provider.

395. The MultiPlan Cartel's underpayments have already caused some healthcare providers to fail, thereby limiting the supply of healthcare goods and services available to

---

[45] Olivia Webb, MultiPlan, the Secret Back-End to Most of the Insurer Industry, is Going Public, Acute Condition (Aug. 5, 2020), https://perma.cc/2WJ7-ZBQ3.

consumers. For example, in a separate lawsuit filed in San Francisco County Superior Court, VHS Liquidating Trust alleges that Verity Health System went bankrupt as a result of the MultiPlan Cartel. On August 31, 2018, Verity Health System filed for Chapter 11 bankruptcy. As a part of that bankruptcy process, on January 6, 2020, Verity Health System announced the closure of the St. Vincent Medical Center in Los Angeles, California.

396.    Small and independent healthcare providers are especially susceptible to the price-fixing of the MultiPlan Cartel. The New York Times report on MultiPlan included interviews of healthcare providers about MultiPlan's effect on their businesses. Kelsey Toney is a behavioral therapist for children with autism in rural Virginia. She typically charges the rates that Virginia pays for people on Medicaid. As reported by The New York Times, "last year, she said, Meritain Health, an Aetna subsidiary, informed her that fair payment for her services was less than half what Medicaid paid, based on calculations by MultiPlan." She was then faced with the prospect of turning her patients away: "I don't want to say, 'I'm sorry I can no longer accept you,' especially when I'm the only provider within an hour," she said. Toney told The New York Times she "has not billed the parents of her two patients covered by Meritain, but going forward she will not accept patients with similar insurance."

397.    On May 1, 2024 The New York Times further reported that "One provider reported slashed payments from UnitedHealthcare, Cigna and an Aetna subsidiary after the insurers routed claims to MultiPlan's most aggressive pricing tool."

398.    In addition, the MultiPlan Cartel's effect of slashing out-of-network reimbursements suppresses revenue for rural hospitals that are in serious danger of failing—cutting off a key source of healthcare goods and services for many communities. According to the Center for Healthcare Quality and Payment Reform, between 2005 and 2019 over 150 rural hospitals

closed. Another 28 rural hospitals closed between 2020 and 2022, despite the COVID-19 pandemic driving record demand for hospital services. Many of the rural hospitals that are still operating are doing so on shoestring budgets. More than 600 rural hospitals, representing nearly 30% of all rural hospitals in the United States, are at risk of closing. Three hundred rural hospitals are at immediate risk of closing because they are losing money on patient services and have more debts than assets.

399.    Since rural hospitals treat fewer patients than urban and suburban hospitals, they have a higher cost of care per patient. As a result, many rural hospitals are at risk of closing because they receive inadequate reimbursements for their services. Therefore, the MultiPlan Cartel's agreement to suppress reimbursement rates to all healthcare providers, including rural hospitals, threatens to drastically cut the supply of healthcare services in several parts of the country. If rural hospitals fail because of the MultiPlan Cartel, the cost of healthcare will increase throughout the United States because patients in areas previously served by those hospitals will only seek acute medical care when they are experiencing very severe symptoms, raising the cost of care.

400.    In its May 1, 2024 report, The New York Times quoted one anonymous rural healthcare provider as saying that MultiPlan "has decimated my life" and caused "the closing of my business," which "left patients having to travel 2.5 hrs for surgery."

401.    MultiPlan attempts to justify its behavior as intended to keep prices down for healthcare consumers, but that is not the case. As an August 5, 2020 analysis explained: "Theoretically, MultiPlan's harsh negotiation tactics should be good for rising American health care costs; insurers are supposed to lower costs by negotiating lower prices on behalf of the patient. But instead, MultiPlan acts like a mafia enforcer for insurers, forcing doctors to accept low payments while insurance premiums for patients . . . somehow continue to rise."[46]

---

[46] See, supra, note 45.

402.    In fact, although MultiPlan claims that its out-of-network claims suppression tools help decrease healthcare costs, the data shows otherwise. According to the Centers for Medicare and Medicaid Services, in 2016, a year before several large health insurance companies joined the MultiPlan Cartel, private health insurance expenditures in the United States were $1.03 trillion. By 2021, private health insurance expenditures in the United States were $1.21 trillion, a 17.48% increase. By 2025, private health insurance expenditures in the United States are projected to be $1.53 trillion, a 48% increase over 2016. In short, MultiPlan's "cost containment" justification fails as a factual matter—private health insurance expenditures are ballooning regardless of the MultiPlan Cartel.

403.    As the MultiPlan Cartel stiffs healthcare providers billions of dollars, MultiPlan's executives continue to be compensated at astronomical levels. For example, in MultiPlan's 2024 Proxy Statement, MultiPlan's then-CEO was reported to have made $10.7 million in total compensation in 2022 and $7.6 million in 2023. Additional executives also made over $1 million in 2023, such as Jim Head, MultiPlan's CFO, who made over $3 million in total compensation in 2023.

404.    Therefore, the MultiPlan Cartel harms competition by systematically underpaying healthcare providers, limiting the amount of revenue that healthcare providers can spend on improving and expanding care, and putting at-risk healthcare providers closer to bankruptcy. MultiPlan cannot justify its conduct. MultiPlan does not contain costs. Its cartel has taken advantage of a rapidly growing healthcare sector to enrich itself at the expense of doctors, nurses, and patients. And the life-saving care provided by healthcare providers is not "exorbitant" as the cartel likes to claim (until they are sworn to tell the truth).

## VIII.  Fraudulent Concealment, Continuing Violation, And Tolling The Statute Of Limitations

405.   Defendants have affirmatively and fraudulently concealed the conspiracy by various means and methods from its inception.

406.   Defendants did so in at least two ways. First, they misled Plaintiff and other providers about how reimbursement rates were set. Second, they actively worked to conceal the conspiracy and ensure its secrecy.

407.   MultiPlan's explanation of its pricing methodology to providers was false and misleading. Moreover, MultiPlan and the other Defendants intentionally hid from providers, including the Plaintiff, that reimbursement prices were actually determined by use of a shared pricing system that used Defendants' real-time, non-public claims data and combined it with their competitors' real-time, non-public claims data to set out-of-network reimbursement rates.

408.   MultiPlan also made false and misleading statements to conceal that it colluded with and orchestrated insurers (i.e., its competitors) to work in concert to artificially suppress payments to healthcare providers.

409.   MultiPlan and the other Defendants also spent years claiming that reimbursements were derived by algorithm, when in fact they were fixed by the cartel's members.

410.   MultiPlan and Defendants also publicly misrepresented that they did not engage in anticompetitive conduct. For example, MultiPlan's published Code of Business Conduct and Ethics states that it is "committed to conducting our business with integrity at all times," and that "only legal and ethical means should be used to gather information about existing and potential competitors."

411.   Similarly, Aetna's Code of Conduct provides that employees must "obey all laws and regulations that apply to Aetna's business," "be honest and act with integrity in all of your

Aetna business dealings," "must not be part of any conduct . . . that is intended to mislead, manipulate, or take unfair advantage of anyone, or misrepresent Aetna products, services, contract terms or policies to a . . . provider," and "[d]o not agree with representatives of a competing company, or with others, to be part of these or any other practices that may illegally restrain competition: fixing prices . . . ."

412.    Cigna's Code of Ethics and Principles of Conduct contain similar misleading information. Cigna says it will "comply with applicable laws" and "will behave ethically." It claims to only "look[] for competitive advantages through legal and ethical business practices," that it "neither accept[s] nor tolerate[s] taking advantage of anyone through, for example, manipulating or misrepresenting information," that it "competes fairly around the world," that it "seek[s] to maintain and grow our business through superior products and services – and not through any improper or anticompetitive business practices" and so "compl[ies] with competition and antitrust laws throughout the world."

413.    United's Code of Conduct also instructs employees to "[a]void discussions with competitors that may appear to restrain competition unreasonably," including "[c]ommunications or agreements with competitors regarding . . . provider reimbursement rates . . . ." The Code specifically cautions against sharing information about provider reimbursement rates by competitors. Specifically, it addresses a hypothetical of an Optum Health employee (subsidiary of United): "Q. I work in Optum Health and received a request from a colleague on my old team at United for some information related to reimbursement rates of other payers. May I provide the data since we are part of the same company? A. Not without consulting your business Legal Representative or Compliance Officer. Optum Health's provider businesses contract with competitors of United and may receive competitively-sensitive information, which must be

protected, and sharing the data requested without review and approval by legal counsel could be a form of unfair competition."

414.    Defendants also took steps to conceal the true nature of their anticompetitive arrangement from providers, including Plaintiff.

415.    Defendants engaged in a secret and inherently self-concealing conspiracy that did not reveal facts sufficient to put Plaintiff on inquiry notice.

416.    Defendants other than MultiPlan privately submitted their own non-public claims data to MultiPlan, and MultiPlan in turn used its proprietary repricing tools, the details of which remain confidential, to propose reimbursement rates. The inner workings and true nature of this process are secrets that are not shared with providers like Plaintiff.

417.    Defendants regularly attended invitation-only industry events, including events held and sponsored by MultiPlan, where they discussed behind closed doors how MultiPlan's repricing tools allowed them to reduce costs by suppressing out-of-network reimbursement rates.

418.    Defendants had private communications and meetings to discuss out-of-network claim repricing, MultiPlan's repricing tools, and use of those tools, including by each Defendant's competitors.

419.    Plaintiff therefore had neither actual nor constructive knowledge of the facts giving rise to their claim for relief. Plaintiff did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of Defendants' conspiracy until shortly before filing this complaint.

420.    Through Defendants' knowing and active concealment of their misconduct, Plaintiff did not receive information that should have put them, or any reasonable person or provider standing in their shoes, on sufficient notice of collusion worthy of further investigation.

421.    Plaintiff could not have been on inquiry notice of MultiPlan's scheme and the extent and effect of the MultiPlan Cartel until the New York Times published concerns about MultiPlan's practices, based on recently unsealed confidential documents in other litigation, on April 7, 2024.

422.    Even if notice had arisen earlier, an ordinary person acting reasonably diligently would not have had the time, resources, or specialized training to uncover the misconduct that Plaintiff, through counsel, alleges herein, earlier than May 2024.

423.    Plaintiff exercised reasonable diligence at all times and could not have discovered Defendants' alleged misconduct sooner because of Defendants' deceptive and secretive actions to conceal their misconduct.

424.    Plaintiff filed this claim as soon as it became aware of the anticompetitive conduct alleged herein, in reliance on its counsel's investigation.

425.    Defendants' fraudulent concealment of their wrongful misconduct has tolled and suspended the running of the statute of limitations concerning the claims and rights of action of Plaintiff arising from the conspiracy earlier in time than the four years immediately preceding the date this action was filed.

426.    Defendants' misconduct also constitutes a continuing violation against Plaintiff. Although formed before 2020, the conspiracy has continued thereafter. Defendants continue to engage in the anticompetitive conduct alleged herein and have taken no affirmative steps to withdraw from it or otherwise disavow it.

## IX.    Anticompetitive Effects And Impact On Interstate Commerce

427.    The MultiPlan Cartel directly damages Plaintiff's business and property and restrains competition in the relevant market. Plaintiff has sustained and continues to sustain economic losses—the full amount of which Plaintiff will calculate after discovery and prove at trial—due to Defendants' artificial suppression of reimbursement rates for out-of-network

healthcare services.

428.    But for Defendants' conspiracy to fix the price paid for out-of-network healthcare services, Plaintiff would have received higher reimbursement rates for out-of-network healthcare services.

429.    While the conspiracy continues, Plaintiff will continue to suffer losses.

430.    The antitrust laws aim to prevent injuries such as those alleged here that stem from a conspiracy among buyers to systematically suppress the price paid for a good or service, such as out-of-network healthcare services. Agreements to reduce price competition or fix prices violate the antitrust laws.

431.    The outsourcing of both insurers' rate-setting decisions and claims negotiation responsibilities, as well as Defendants' anticompetitive information exchange, has corrupted the market for out-of-network provider services, replacing independent centers of decision-making with a single effective decisionmaker, MultiPlan, and disrupting the competitive process. Insurers' collective use of MultiPlan's repricing services to set artificially low reimbursement rates subverts the competitive process by depriving the market of "independent centers of decisionmaking" and replacing them with decision-making on prices by one shared pricing "brain."

432.    Economic theory and antitrust jurisprudence show that such joint delegation schemes, particularly when accompanied by information exchange, reduce the intensity of price competition and artificially suppresses compensation below competitive levels. In recent guidance to human resources professionals, the Department of Justice Antitrust Division ("DOJ") stated that "[s]haring information with competitors about terms and conditions of employment" can be anticompetitive in that it decreases competition below competitive levels by allowing firms to match each other's compensation rather than compete for services by offering additional

compensation.

433.    That is precisely what has happened with respect to the prices insurers pay for out-of-network care consumed by their subscribers. As a result of the MultiPlan Cartel, reimbursement rates provided to healthcare providers, including Plaintiff, for out-of-network claims have been suppressed below competitive levels.

434.    According to an April 2020 study published by the Office of the New York State Comptroller, depending on the service provided, out-of-network reimbursements paid based upon MultiPlan's repricing methodology were 1.5 to 49 times lower than UCR-based reimbursements for the same services. And whereas prior to 2016, reimbursement rates typically rose over time, since 2016 they have fallen year-over-year.

435.    The suppression of out-of-network reimbursement rates caused by the MultiPlan Cartel also indirectly suppresses in-network rates by undermining the ability of providers to leave insurance networks if in-network rates fall too low, a key form of leverage providers would have in the negotiation of those in-network rates in the absence of the MultiPlan Cartel. Because of the MultiPlan Cartel, even if providers attempt to leave insurance networks and bill subscribers on an out-of-network basis based on the prevailing market rate, MultiPlan ensures that they will receive reimbursement amounts that are roughly equal to in-network rates and which are unreasonably low. By undermining the economic viability of providers performing services on an out-of-network basis, insurers strip providers of a key form of leverage—the ability to decline network participation if in-network rates are too low—thereby suppressing in-network reimbursement rates.

436.    There is also no potential for speculative damages, duplicative recovery, or complex apportionment of damages. Each claim that Plaintiff submitted to members of the

MultiPlan Cartel for out-of-network goods and services was underpaid compared to the amount that would have been paid as a reimbursement but for the cartel agreement. When Plaintiff was systematically underpaid for out-of-network claims, it often did not have the practical or legal ability to obtain the balance of those charges from the patient or any other payor.

437.    Plaintiff is the most efficient enforcer of the antitrust laws with respect to the MultiPlan Cartel. Plaintiff was directly injured when it was underpaid for submitted out-of-network claims due to the cartel agreement. The damages that Plaintiff suffered are not contingent, speculative, or complex. Due to the MultiPlan Cartel's conduct, and as a practical and legal matter, Plaintiff cannot seek payment for these charges from any other source.

438.    Plaintiff suffered antitrust injury as a result of the MultiPlan Cartel. For decades, federal courts have recognized that agreements between competitors to underpay providers for goods and services are illegal per se because buyers' cartels are so pernicious that they will almost always harm competition.

439.    By reason of the unlawful activities alleged herein, Defendants substantially affected interstate trade and commerce throughout the United States, and caused antitrust injury to Plaintiff.

## I.    Causes of Action

### Count I
### Agreement in Restraint of Trade
### Section 1 of the Sherman Act, 15 U.S.C. § 1

440.    Plaintiff incorporates each allegation above as if fully set forth herein.

441.    Plaintiff seeks monetary and injunctive relief under Sections 4 and 16 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

442.    Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in the purchase and reimbursement of out-of-network healthcare

services for subscribers, and in the sale of health insurance plans.

443.    Beginning in or around 2015, Defendants entered into and engaged in an unlawful contract, combination, or agreement, in restraint of interstate trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

444.    Specifically, Defendants have combined to form a cartel to artificially suppress out-of-network reimbursement rates paid to healthcare providers across the United States and exchanged non-public and competitively sensitive information with one another in order to accomplish that purpose.

445.    Defendants' conduct was undertaken with the intent, purpose, and effect of artificially suppressing out-of-network reimbursement rates below the competitive level.

446.    Defendants perpetrated this scheme with the specific intent of decreasing reimbursement rates for their own benefit.

447.    Defendants' conduct in furtherance of the unlawful scheme described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

448.    Defendants' Cartel has caused Plaintiff to suffer damages in the form of artificially suppressed reimbursement rates.

449.    The contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors in the market for healthcare provider services.

450.    In furtherance of this contract, combination, or conspiracy, Defendants have committed various acts, including as follows:

- The Insurer Defendants provided real-time, private, confidential, and detailed internal claims data to MultiPlan for use in MultiPlan's out-of-network claim repricing tools.

125

- MultiPlan sold and operated its out-of-network claim repricing tool that repriced the reimbursement rate for out-of-network healthcare services claims.

- Defendants knowingly used the same out-of-network claim repricing tool that incorporated other Defendants' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for out-of-network healthcare services claims.

- The Insurer Defendants paid reimbursements for out-of-network healthcare services claims at the rates recommended by MultiPlan's repricing tool.

- The Insurer Defendants outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the reimbursement rate of out-of-network healthcare claims at the rates recommended by its repricing tool.

- Defendants exchanged sensitive, real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan out-of-network claims repricing tool.

- Defendants used many forms and methods of bilateral and multilateral communication across various settings and venues concerning the reimbursement rate for out-of-network healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tool, which had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

451.    There are no procompetitive justifications for Defendants' Cartel, and any proffered justifications, to the extent cognizable, could be achieved through less restrictive means.

452.    Defendants' Cartel is unlawful under a per se mode of analysis. In the alternative, Defendants' Cartel is unlawful under either a quick look or rule of reason mode of analysis.

453.    As a direct and proximate result of Defendants' unlawful scheme, Plaintiff has suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition unless Defendants' conduct is enjoined.

454.    Plaintiffs are entitled to recover three times the damages sustained by them, interest

on those damages, together with reasonable attorney's fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

455.    Plaintiffs are entitled to a permanent injunction that terminates the unlawful conduct alleged herein, as well as any other equitable relief the Court deems proper.

**II.    <u>Petition for Relief</u>**

456.    Plaintiff petitions for the following relief:

        a.    A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Antitrust Act;

        b.    A judgment and order requiring the Defendants to pay damages to Plaintiff, trebled;

        c.    An order enjoining the Defendants from engaging in further unlawful conduct;

        d.    An award of attorneys' fees and costs;

        e.    An award of pre- and post-judgment interest on all amounts awarded; and

        f.    Such other and further relief as the Court deems just and equitable.

**III.    <u>Demand for Jury Trial</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

Dated: September 4, 2024    **Arnall Golden Gregory LLP**

_/s/ Matthew M. Lavin_
Matthew M. Lavin

Matthew M. Lavin (pro hac vice to be filed)
matt.lavin@agg.com
Arnall Golden Gregory LLP
1775 Pennsylvania Ave. NW, Suite 1000
Washington, DC 20006
Telephone: 202.677.4030
Facsimile: 202.677.4031

**Napoli Shkolnik PLLC**

_____
Hunter Shkolnik

Hunter Shkolnik (HS4854) (Admitted SDNY)
NS PR Law Services, LLC
1302 Avenida Ponce de León
Santurce, Puerto Rico 00907
Tele: (787) 493-5088
Fax: (646)843-7603
Email: Hunter@NSPRLaw.com

**MAZIE SLATER KATZ & FREEMAN, LLC**

_/s/ Eric D. Katz_
Eric D. Katz


Eric D. Katz (EK7630) (Admitted SDNY)
Mazie Slater Katz & Freeman, LLC
103 Eisenhower Parkway, 2nd Floor
Roseland, NJ 07068
Telephone: (973) 228-9898
Fax: (973) 228-0303
Email: Ekatz@mazieslater.com


Additional Co-Counsel

**COHEN HOWARD LLP**

Leslie S. Howard, Esq.
Cohen Howard LLP
766 Shrewsbury Ave., Suite 200
Tinton Falls, New Jersey 07724
Telephone: (732) 747-5202
Email: Lhoward@cohenhoward.com

Attorneys for Plaintiff